# Richmond

RICHMOND, FREDERICKSBURG AND POTOMAC RAILROAD COMPANY v.
HUGHES-KEEGAN, INC., ET AL.

January 16, 1967.

Record No. 6328.

Present, All the Justices.

*Lewis T. Booker* (*Hunton, Williams, Gay, Powell & Gibson*, on brief), for the plaintiff in error.

*Edward A. Marks, Jr.* (*Sands, Anderson, Marks & Clarke*, on brief), for the defendants in error.

GORDON, J., delivered the opinion of the court.

The Richmond, Fredericksburg & Potomac Railroad Company brought this action to recover $19,598.02, plus costs and attorneys' fees, from Hughes-Keegan, Incorporated, a contracting firm. The Railroad sought recovery under the indemnification clause of a contract dated January 1, 1956, between Hughes-Keegan and the Railroad.[1] The indemnification clause reads:

> "The Contractor [Hughes-Keegan] shall indemnify and save harmless the Company [the Railroad] from and against all losses and all claims, demands, payments, suits, actions, recoveries and judgments of every nature and description made, brought or recovered against the Company by reason of any act or omission of the Contractor, his agents or employees, in the execution of the work or in guarding the same."

The Railroad alleged that this clause was applicable to claims made against it by a Railroad employee and the estate of a deceased Railroad employee for injury and death caused by an accident in the Railroad yards on July 27, 1961. The Railroad settled these claims,

---

(1) As set forth later in the text, The Fidelity and Casualty Company of New York was joined as a party defendant.

which were made under the Federal Employers' Liability Act, and brought this action for indemnification.

At the conclusion of the Railroad's evidence, the trial Court sustained Hughes-Keegan's motion to strike the evidence and entered judgment for Hughes-Keegan. So we have before us only the Railroad's evidence and the evidence of an out-of-town witness for Hughes-Keegan, who testified out of order by consent of counsel.

The question is whether, within the meaning of the indemnification clause, the Railroad employees' claims arose out of an act or omission of agents of Hughes-Keegan (the Contractor) in the execution of work pursuant to the 1956 contract. It is our function to interpret the indemnity clause and the other provisions of the contract that relate to this question. *Magann Corp.* v. *Electrical Works*, 203 Va. 259, 123 S.E.2d 377 (1962).

Under the 1956 contract, Hughes-Keegan agreed to "furnish all the materials, superintendence, labor, tools, equipment and transportation, and . . . execute, construct and finish . . . such work for the . . . [Railroad] or any work which the . . . [Railroad] is obligated to do for the Richmond Terminal Railway Company or the Richmond Land Corporation . . . as it shall be called upon to do by . . . the Railroad . . ." "Such work shall be called for by . . . a proceed order or orders addressed to . . . [Hughes-Keegan], setting out a description of the work to be done under the terms of this contract . . ." The Railroad agreed to pay Hughes-Keegan "the complete cost of such work to . . . [Hughes-Keegan] plus 10%, except for . . . [Hughes-Keegan's] equipment which shall be billed at an agreed rental (set out in Appendix A hereto attached as a part hereof) without percentage added . . ."

Appendix A sets forth the agreed rental for various items of Hughes-Keegan's equipment. Appendix A also contains this provision, which bears directly on the decision of this case: "Equipment not owned by Contractor [Hughes-Keegan] but rented by him for use on Railroad work authorized by Railroad's Authorized Representative, will be paid for at rental cost to Contractor plus 10%, plus actual cost of repairs paid for by Contractor."

The Railroad had dealt exclusively with Hughes-Keegan in the Richmond area for many years. It preferred this arrangement "in order that there would be one billing, would be one insurance coverage, would be one person we would be dealing with". The Railroad did not know at any given time what equipment Hughes-Keegan

had available for Railroad work. It relied upon Hughes-Keegan to furnish the equipment, either from its own stock or by arrangement with other persons.

Hughes-Keegan preferred that the Railroad deal only with it. On one occasion it complained that the Railroad had paid another supplier of equipment directly. The Railroad admitted its error, and paid Hughes-Keegan the 10% override provided for under the 1956 contract. (See Hughes-Keegan's August 10, 1961 bill set forth, *post*.)

In July 1961 the Railroad was building new facilities and laying new tracks in its Richmond yards. On July 26, the day before the accident, the Railroad requested Hughes-Keegan to furnish a truck-mounted crane. Because Hughes-Keegan did not have an available truck-mounted crane, it arranged for Moore Crane Service, Inc. to send the crane to the Railroad yards on July 27 with a truck operator and a crane operator.

As directed, the Moore employees proceeded with Moore's truck-mounted crane to the Railroad yards and reported to the Railroad foreman for instructions. Before they arrived the Railroad had assembled new tracks and accompanying ties into sections called track panels, weighing several tons each. The Railroad foreman directed the Moore employees to carry a track panel to a specified place in the yards. They proceeded to carry the panel by means of the crane, with the assistance of Railroad employees who held ropes attached to the panel to steady it.

En route the crane or its cable made contact with an overhead electric power line. At the time of contact two Railroad employees, whose injury and death gave rise to this action, were touching the track panel or holding ropes connected to it. Both were severely burned and one died later. The Railroad reported the accident to Hughes-Keegan, but made no report to Moore.

Moore submitted its bill for $147.25 to Hughes-Keegan for "Work: Unit crane w/operators to handle job as directed". This bill included work on July 27 (the day of the accident) and July 28.

Hughes-Keegan submitted a bill to the Railroad for the $147.25 charged it by Moore, plus 10% and an additional amount for insurance coverage. Its bill read:

"Hughes-Keegan, Inc.
General Contractors
Richmond 30, Va.

August 10, 1961

Richmond, Fredericksburg & Potomac Railroad Co.
Broad Street Station
Richmond, Virginia

To Hughes-Keegan, Inc.

Furnish trucks and trailers as requested by Engineer of Construction for assisting in various Maintenance of Way projects. A.F.E. 9855

*Proceed Order #1-61*                                          *July 1961*

Material:

| | |
|---|---:|
| Lockwood Brothers, Inc. | $   436.00 |
| *Moore Crane Service* | *147.25* |
| Moore Crane Service | 180.00 |
| Garrett & Company | 655.42 |
| C. & P. Telephone Co. | 1.20 |
| | $1,419.87 |
| *Plus 10%* | *141.99* |
| | $1,561.86 |
| Additional Contractual Insurance Coverage at .68 per $100.00 Contract[2] | 10.62 |
| | $1,572.48 |
| Less amount invoiced by Garrett & Co. directly to R.F. & P. R.R. Co.[3] | 655.42 |
| Amount due this invoice | $917.06" |

[Emphasis supplied] The Railroad paid Hughes-Keegan's bill.

---

(2) It should be noted that Hughes-Keegan charged the Railroad for additional contractual insurance. The insurance coverage afforded by The Fidelity and Casualty Company of New York is discussed later.

(3) This mistaken direct payment by the Railroad has been referred to earlier. As shown by the bill, Hughes-Keegan charged a 10% override on the amount paid.

The language "Furnish trucks and trailers as requested by Engineer of Construction for assisting in various Maintenance of Way projects. A.F.E. 9855" and "Proceed Order #1-61", appearing in Hughes-Keegan's August 10, 1961 bill, calls for explanation. The evidence gives the explanation.

The Railroad issued proceed orders to Hughes-Keegan at the beginning of each year, outlining services and equipment to be furnished during the year pursuant to the 1956 contract. Proceed Order #1-61, the first order issued in 1961, contained the emphasized language set forth in the preceding paragraph. "A.F.E. 9855", referring to a capital improvement expenditure, was later added to Proceed Order #1-61.

Although Proceed Order #1-61 mentioned only trucks and trailers, the Railroad's Chief Engineer described it as "an open order, for any type of equipment we may need". He said the Railroad could not list in proceed orders all equipment that might be needed during the year. The proceed orders therefore were intended to "[o]pen the gate for the year's operation for any type of equipment". Hughes-Keegan so interpreted Proceed Order #1-61. During the first six months of 1961 Hughes-Keegan had furnished equipment other than trucks and trailers, for which it submitted invoices under Proceed Order #1-61.

Counsel for Hughes-Keegan contends that Moore and Hughes-Keegan were independent contractors. With respect to each other, they may have been independent contractors. Nevertheless, when the accident happened on July 27, 1961, Moore and its truck and and crane operators were "agents" of Hughes-Keegan, within the meaning of the indemnity clause of the 1956 contract.

Hughes-Keegan agreed under the 1956 contract to supply equipment and perform work for the Railroad. The indemnity clause was designed to protect the Railroad from liability for acts or omissions during the execution of the work called for under the contract. The parties contemplated that Hughes-Keegan could perform on its own or through others. When Hughes-Keegan called upon Moore to discharge an obligation of Hughes-Keegan under the 1956 contract, it made Moore and the Moore employees its agents for the purposes of the contract.

Counsel for Hughes-Keegan contends further that the provision of Appendix A dealing with equipment rented by Hughes-Keegan for use on Railroad work (set forth, *ante*, and repeated in

the footnote below[4]) does not provide for payment of the wages of the lessor's employees. He argues that Hughes-Keegan therefore was not performing any work under the 1956 contract when the accident happened, but was merely supplying equipment belonging to another person for use by the Railroad.

Hughes-Keegan, however, properly interpreted the provisions of the 1956 contract and Appendix A as requiring Hughes-Keegan not only to supply rented equipment when it did not have the required equipment at hand, but also to supply persons to operate the rented equipment in the execution of work for the Railroad. Hughes-Keegan acknowledged that it had directed Moore to perform work when it paid Moore's bill for "Work: Unit crane w/operators to handle job as directed" on the day of the accident. Hughes-Keegan then submitted its bill of August 10, 1961 to the Railroad, which included Moore's charge for the crane and operators, plus a 10% override. Had Hughes-Keegan dispatched its own operators with Moore's equipment, Hughes-Keegan would have been entitled to charge the Railroad for its employees' wages plus 10%.

■ Counsel argues further that Moore's employees were engaged on the day of the accident "in the performance of railroad's own work, under the supervision and direction of railroad's supervisory employees, and in the manner the railroad desired such equipment to operate". But Moore's employees were nonetheless engaged in work called for under the 1956 contract. Hughes-Keegan rendered its bill for that work pursuant to the 1956 contract, and the Railroad paid the bill.

Hughes-Keegan's liability under the indemnity clause does not depend upon whether Hughes-Keegan's "agents", the truck and crane operators, committed a negligent act. The indemnity clause imposes liability upon Hughes-Keegan for acts of its agents in performing work pursuant to the contract. An act of Hughes-Keegan's "agents" —putting the crane in contact with the power line—gave rise to the claims against the Railroad.

The evidence now before us presents no jury issue. In view of our interpretation of the indemnity clause and other relevant provisions of the 1956 contract, the Railroad is entitled under this evidence to

---

(4) "Equipment not owned by Contractor [Hughes-Keegan] but rented by him for use on Railroad work authorized by Railroad's Authorized Representative, will be paid for at rental cost to Contractor plus 10%, plus actual cost of repairs paid for by Contractor."

judgment against Hughes-Keegan.[5] The case must be remanded for a new trial, however, because the evidence was stricken at the conclusion of the Railroad's case and Hughes-Keegan has not yet brought forth its evidence.

The Railroad joined The Fidelity and Casualty Company of New York as a party defendant to this action, seeking a joint judgment against it and Hughes-Keegan. The Railroad asked for judgment against Fidelity and Casualty Company under an endorsement to a comprehensive general liability policy issued by the Company to Hughes-Keegan. The endorsement, as set forth in the Railroad's motion for judgment, reads:

> "Contractual Endorsement #1
> "Agreement between Insured and R.F. & P. Railroad Company, Richmond Terminal Railway Company and Richmond Land Corporation.
> "The Contractor shall indemnify and save harmless the company from and against all losses and all claims, demands, payments, suits, actions, recoveries and judgements of every nature and description made, brought or recovered against the Company by reason of any act or ommission of the Contractor, his agents or employees, in the execution of the work or in guarding the same."

Fidelity and Casualty Company filed a demurrer on the grounds that the motion for judgment disclosed no contractual obligation on its parts to anyone other than Hughes-Keegan, and that the public policy of Virginia precluded the joinder of a liability insurance carrier with its insured in a direct action by an injured person. The trial Court sustained the demurrer and dismissed Fidelity and Casualty Company as a party defendant.

We disagree with Fidelity and Casualty Company's position set forth in its first ground for demurrer. The Endorsement identifies the 1956 agreement, referring specifically to Hughes-Keegan ("Insured") and the Railroad ("R.F. & P. Railroad Company"). The Endorsement then repeats the indemnity clause contained in the 1956 agreement. We can interpret the Endorsement only as intending to cover performance of Hughes-Keegan's undertaking as set forth in

---

(5) Although contending for a contrary interpretation, counsel for Hughes-Keegan agrees that the evidence presents no jury question. He says in his brief "to claim that there was a factual issue for a jury . . . under which a jury might . . . find [for the Railroad] is . . . to abandon the time-honored precept that the construction of contracts is for the court, and not for the jury".

the indemnity clause. Because the indemnity clause ran to the Railroad, and the Railroad is named in the Endorsement, the Railroad is a third party beneficiary under the Endorsement. Code § 55-22 permits a third party beneficiary to sue the person who made a covenant or promise for its benefit. Va. Code Ann. § 55-22 (Repl. vol. 1959).

In its second ground for demurrer Fidelity and Casualty Company referred to the public policy that precludes an injured person from bringing a direct action against a liability insurance carrier and its insured. Admittedly under Virginia law, an injured person must reduce his claim to judgment against the tort-feasor before bringing action against the company that issued a liability policy to the tort-feasor. But this action was brought by the Railroad, not by persons injured in an accident. Moreover, the Railroad did not sue in tort, but on its contract with Hughes-Keegan.

In *Moorman v. Nationwide Mutual Ins. Co.*, 207 Va. 244, 148 S. E.2d 874 (1966), we upheld the right of a passenger in the insured's automobile to bring a direct action against the insurer under the provision of a policy providing medical payment coverage. The plaintiff in that case could bring a direct action against the insurer because she was within the class protected by that coverage and, therefore, a third party beneficiary. The Railroad, which was named in Fidelity and Casualty Company's Endorsement, can bring a direct action against the Company because it is a beneficiary under the Endorsement.

Counsel for Fidelity and Casualty Company argues that the 1956 contract required Hughes-Keegan to obtain insurance applicable only to negligent acts.[6] Hughes-Keegan, however, obtained the broad coverage set forth in Endorsement #1, which tied the coverage to Hughes-Keegan's undertakings under the indemnity clause of the 1956 agreement. Hughes-Keegan and the Railroad are entitled to the protection afforded by the Endorsement in accordance with its terms. Fidelity and Casualty Company is bound by the terms of the Endorsement that it issued.

We therefore reverse the order sustaining the demurrer of The

---

(6) "Comprehensive automobile and liability insurance, including Contractor's protective insurance, shall be carried by the Contractor with bodily injury limits of not less than $100,000 each person and $500,000 each accident and property damage limit of not less than $250,000 each accident. This insurance shall apply to bodily injury to Agents and employees of the . . . [Railroad] when caused by the negligence of the Contractor, its agents or employees."

Fidelity and Casualty Company of New York and the judgment entered for Hughes-Keegan, Incorporated, and remand the case for a new trial.

*Reversed and remanded.*