## Richmond

## RICHMOND, FREDERICKSBURG AND POTOMAC RAILROAD COMPANY V. SUTTON COMPANY, INC., AND UNITED STATES FIRE INSURANCE COMPANY

November 23, 1977.

Record No. 761269.

Present: Carrico, Harrison, Cochran, Harman and Poff, JJ.

*Charles A. Hartz, Jr. (Urchie B. Ellis*, on briefs), for plaintiff in error.

*Edward A. Marks, Jr. (Sands, Anderson & Marks*, on brief), for defendants in error.

Poff, J., delivered the opinion of the Court.

Richmond, Fredericksburg and Potomac Railroad Company (Railroad) filed a motion for judgment against Sutton Company, Inc., (Sutton) and Sutton's insurer, United States Fire Insurance Company, to recover $229,536.15 allegedly due under a contract of indemnification dated January 2, 1973. The damages sought represented losses resulting from a train derailment which occurred June 1, 1973 at Lorton where Sutton was installing a "crossover" connecting two main line railroad tracks.

Following a pre-trial conference, the trial court entered an order on May 28, 1976 ruling, *inter alia,* that the language of the contract was ambiguous, that extrinsic evidence would be admissible to show what the parties intended the language to mean and "the scope and nature of the work to be covered thereby", and that, aside from questions concerning damages, the sole issue would be "[w]hether the work being performed by Sutton on June 1, 1973 was being done under the said contract dated January 2, 1973." [1]

At the conclusion of Railroad's testimony and after considering 22 exhibits introduced by Railroad and 20 exhibits filed during cross-examination by Sutton, the trial court overruled Sutton's motion to strike. Upon reconsideration of certain exhibits and further argument by counsel, the trial court reversed its ruling, sustained Sutton's motion, and entered a final order June 3, 1976 granting summary judgment in favor of both defendants. Judgment was based upon the trial court's conclusion "that there is just no reasonable way reasonable men can differ . . . that the railroad intended that there should have been in existence a separate and distinct contract out from under the [January 2, 1973 contract]." On June 16, 1976, the trial court overruled Railroad's motion to set aside the judgment. This ruling was based upon a finding

---

[1] No error was assigned to these rulings, and on appeal they have become the law of the case.

that, because Railroad had tendered Sutton a contract specifically describing the Lorton job (the facts concerning which will be detailed later), "reasonable men couldn't differ, but that the railroad itself did not consider that this work was done under the [January 2, 1973] contract".

The writ of error was limited to consideration of Railroad's assignment of error number three which reads in pertinent part as follows:

"The trial court erred in sustaining the motion to strike . . . because . . . [t]he evidence before the trial court was sufficient to permit the jury to decide whether the work . . . was being performed pursuant to the January 2, 1973 contract. . . ."

We believe, as Sutton says, that this "is the only real point before this Court". We consider, therefore, whether the testimonial and documentary evidence adduced by Railroad and the documentary evidence filed by Sutton was sufficient to raise a jury question on the issue tried below.

Railroad's principal witness was William Gilbert who, as Engineer of Track, was responsible for both construction and maintenance of tracks. As early as 1970, Sutton, an independent contractor, had been performing contract work for Railroad. Some of the contracts were verbal, evidenced only by Sutton's post-work invoices; some were created by acceptance of Sutton's prior written proposals; and some were formalized, sometimes before and sometimes after work began, on Railroad's printed contract form MW-66. Most of the contracts were "cost-plus"; several were "fixed-price" or "ceiling-price". Pursuant to a general understanding that Railroad would keep the Sutton work crew occupied "as long as there was work for them", Gilbert assigned the projects and had the crew moved from one job to another as circumstances required. Usually, Gilbert discussed the jobs in advance with R. H. Blevins, Sutton's vice-president, but on one or two occasions, Gilbert simply conveyed instructions through his subordinate, Mr. Proffitt, directly to Sutton's superintendent, Mr. Phillips.

In 1972, Gilbert and the late L. B. Cann, Railroad's Chief Engineer and Gilbert's superior, held a meeting with Blevins. Concerning that meeting, Gilbert testified:

"When we first began using Sutton Company, we were making individual contracts for each work they did. And it became

burdensome. So we made a blanket contract to cover any work done during an entire year."

Gilbert drafted language to fill the blank spaces on form MW-66, and the parties executed "the first blanket contract" on July 5, 1972. A "second blanket contract", identical in every material respect to the first, was executed on January 2, 1973. The pertinent parts of those contracts (with Gilbert's language italicized) provided:

"The Contractor [Sutton] ... shall execute ... the following work:

*"Miscellaneous work to be done as directed by the Engineer of Track during the year 1973.*

....

"In consideration of the completion of the work ... the Company [Railroad] shall pay to the Contractor the complete cost of such work to the Contractor plus the following percentages: *15% overhead, 15% profit.*

....

"Before doing any work under this contract the Contractor shall secure and keep in effect ... the following items:

....

"(d) Comprehensive automobile and general liability insurance, including Contractor's protective insurance shall be carried by the Contractor.... This insurance shall apply to ... damage to the property of the Company when caused by the negligence of the Contractor ... and shall cover the contractual obligation to indemnify Company set forth below.

....

"The Contractor shall indemnify and save harmless the Company from and against all losses ... growing out of or in any manner directly or indirectly caused by the execution of the work or in guarding the same.

....

"Contractor assumes all risks of, and will repair at his sole cost prior to the completion and acceptance of the entire work by the Company, all damages to materials and work occasioned by any casualty or other cause due to the negligence of the Contractor."

The certificate of insurance issued by Sutton's insurer on December 27, 1972 described the "operations" covered as "Miscellaneous work for Richmond, Fredericksburg & Potomac Railroad Company", and under the words "Designation of Contracts", listed the following:

"AGREEMENTS BETWEEN RICHMOND, FREDERICKSBURG & POTOMAC RAILROAD COMPANY AND SUTTON COMPANY, INC. (CONTRACTOR)

"CONSTRUCTION AGREEMENTS — INDEMNIFICATION OF RAILROADS — AGREEMENTS INDEMNIFYING RAILROADS IN CONNECTION WITH OPERATIONS INVOLVING AN EXPOSURE TO ACTUAL RAILROAD TRAIN HAZARDS".

As defined in the certificate, " 'contractual liability' means liability expressly assumed under a written contract or agreement". A copy of the January 2, 1973 contract was mailed to L. T. Nuckols, Jr., an independent insurance agent. In the margin of that copy, which was introduced as an exhibit, was the penciled notation: "This is blanket contract for work not to exceed $1000.00 per agreement with Mr. Cann and Mr. Gilbert." Nuckols testified that the notation was "on the contract when I received it" but "I don't know who wrote it on there."

Gilbert did not personally talk with Blevins in advance of the Lorton crossover project. However, sometime in May 1973, Proffitt told Phillips that "this would probably be one of the next jobs coming up." On May 24, they "walked over the location . . . and made marks on the rails as to where the point of switch was to be". The next day, Phillips' crew unloaded the materials. Work was suspended during the holiday weekend and resumed on May 29. The derailment occurred on June 1.

A letter drafted by Cann and dated June 8 was hand-delivered that day to Blevins. Attached was a contract on form MW-66 signed by Cann. The contract, back-dated to May 25, 1973, was identical to the blanket contract in all material respects, except that it described the Lorton project in specific language. There was an "internal disagreement" among Railroad's officials about the need for a specific contract, and Gilbert testified that it was prepared and delivered upon advice of counsel, "[j]ust for double assurance, I guess, that we were covered." Blevins took the

contract with him but declined to sign it and marked it "rejected".

Sutton completed construction of the crossover and submitted its Invoice 1745 on June 28, 1973. The total billing of $16,682.08 included the cost of labor and materials, 15% for overhead, 15% for profit, and a separate item of $271.92 for "contractual liability insurance." Railroad paid the invoice in full.

Gilbert testified that the parties intended that the "blanket contract would be used anytime it was not superseded by another contract" and that it "covered everything that was not covered by something else." As a "rule of thumb", a specific contract was negotiated "for a capital expenditure job" or a job which "was going to [involve] a substantial amount of money", but "[i]t would be at the railroad's option as to whether we wanted a separate contract for our own internal accounting purposes." The Lorton project, he said, was "under the capital expenditure account."

Reviewing the testimonial and documentary evidence, Railroad argues that all projects, whether capital expenditure or maintenance, which were commenced without prior specific contract were covered by the blanket contract; that projects for which a specific contract was executed after work was begun or completed were covered by the blanket contract until the specific contract was signed; and that all projects, including the Lorton project, were thus covered by written contracts of indemnity.

Reviewing the same evidence, Sutton contends, as it alleged in its grounds of defense, that the blanket contract was intended to cover only miscellaneous repair jobs costing less than $1000; that capital expenditure projects were customarily performed under specific contracts; and that, absent a specific contract for the Lorton project, Sutton was not obligated to indemnify Railroad.

The numerous exhibits introduced by both parties were designed to show a "course of dealing" supporting their respective positions. Some were explicated by testimony; many were not. As construed by Railroad, the exhibits reflect examples of small repair jobs performed under specific contracts, large repair jobs performed without specific contracts, capital expenditure projects performed under specific contracts, and capital expenditure projects performed under the blanket contract. As Sutton construes the exhibits, they reflect numerous examples of small repair jobs performed under the

blanket contract and several examples of "jobs calling for construction of turnouts, crossovers and switches [which] were almost without exception the subject of specific contracts".

Relying upon *Railroad* v. *Hughes-Keegan, Inc.*, 207 Va. 765, 152 S.E.2d 28 (1967), Railroad says that the content of Sutton's Invoice 1745 raises an inference that Sutton itself considered the Lorton project covered by the blanket contract. The billings for cost, overhead, and profit were in accord with the terms of the blanket contract; the insurance premium was billed pursuant to indemnity insurance required by the blanket contract; and the "order number" on the invoice was labeled "verbal" in the same manner as the order numbers on invoices introduced by Sutton as samples of jobs performed under the blanket contract. Distinguishing *Hughes-Keegan* on its facts, Sutton draws a different inference. Pointing to the paragraph in the blanket contract which requires Sutton, prior to Railroad's acceptance of its work, to repair and bear the cost of damages resulting from Sutton's negligence, Sutton says that Railroad's acceptance of and payment for the work without invoking this paragraph raises an inference that Railroad did not consider the Lorton project covered by the blanket contract.

The same inference arises, Sutton contends, from Railroad's efforts to persuade Blevins to sign the back-dated contract. Railroad argues that such an inference is defeated by the course of dealing disclosed by the evidence. Citing Gilbert's testimony and certain exhibits relating to projects performed under specific contracts executed after work was begun or fully completed, Railroad says that execution of back-dated contracts was a matter of common practice, initiated at Railroad's option to facilitate internal accounting procedures.

■ The issue tried in the lower court was what work the parties intended the blanket contract to cover. Under the law of the case, the language of that contract is ambiguous and extrinsic evidence is competent to resolve the ambiguity. See footnote 1. What the parties intended, therefore, is a question of fact to be determined from the circumstances surrounding the making of the contract and from the course of dealing under it.[2]

---

[2] As applied to transactions covered by the Uniform Commercial Code, a course of dealing is defined as "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." Code § 8.1-205(1) (Added Vol. 1965).

At the time Sutton moved to strike the evidence, the evidence was in conflict. Gilbert's testimony concerning the circumstances and intent of the contracting parties squarely contradicted the import of the penciled notation someone made upon the copy of the blanket contract mailed to Sutton's insurer; and while some of the evidence tended to support one version of the course of dealing and the inferences to be drawn therefrom, other evidence tended to support the opposite version and contrary inferences.

> "[I]n ruling on a motion to strike plaintiff's evidence all inferences which may be fairly drawn from the evidence must be considered most favorably to the plaintiff, and where there are several inferences which may be drawn, though they may differ in degree of probability, the court must adopt those most favorable to the party whose evidence it is sought to have struck out, unless the inferences be strained, forced or contrary to reason. [Citations omitted]." *Williams* v. *Chesapeake Bay Bridge*, 208 Va. 714, 717, 160 S.E.2d 573, 575-76 (1968); quoted with approval, *Semones* v. *Johnson*, 217 Va. 293, 295, 227 S.E.2d 731, 733 (1976).

*See Williams* v. *Vaughan*, 214 Va. 307, 309, 199 S.E.2d 515, 517 (1973), explaining the reason for the rule governing motions to strike.

■ Considering the evidence as a whole and the alternative inferences it supports, we are of opinion that reasonable men could reach different conclusions as to whether the parties intended the blanket contract to cover projects such as the Lorton project, and we hold that the trial court erred in sustaining the motion to strike and in entering summary judgment for the defendants. Rule 3:18. The judgment is reversed and the case will be remanded for a new trial.[3]

*Reversed and remanded.*

---

[3] Railroad designated for printing in the appendix its discovery interrogatories, Sutton's answers thereto, its request for admissions addressed to Sutton's insurer, the insurer's response thereto, and a portion of a discovery deposition, none of which was made a part of the evidence or considered by the trial court in reaching its decision. Railroad also designated for printing certain testimony concerning the cause of the derailment and the nature and extent of the damages sustained, none of which was germane to the assignment of error to which the writ of error was limited. It appears that approximately 30% of the contents of the appendix was designated in violation of Rule 5:38 and, pursuant to the provisions of that rule, 30% of the cost of printing the appendix will be assessed against Railroad.