998 F.2d 1009
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
MONEY POINT DIAMOND CORPORATION, t/a Jacobson Metal Company;
Money Point Land Holding Corporation, Plaintiffs-Appellants,
v.
The UNION CORPORATION, Defendant-Appellee.
The Union Corporation, Plaintiff-Appellee.
v.
Fred Jacobson; George B. Ginsburg, Defendants-Appellants.
and
Robert Copeland, Defendant.
Money Point Diamond Corporation, t/a Jacobson Metal Company;
Money Point Land Holding Corporation, Plaintiffs,
v.
The Union Corporation, Defendant-Appellee.
The Union Corporation, Plaintiff-Appellee,
v.
Robert O. Copeland, Defendant-Appellant,
and
Fred Jacobson; George Ginsburg, Defendants.
 Nos. 92-2539, 92-2540.
 United States Court of Appeals,
Fourth Circuit.
 Argued: June 9, 1993.
Decided: July 23, 1993.
 
 Appeals from the United States District Court for the Eastern District of Virginia, at Norfolk.
 Winthrop Allen Short, Jr., KAUFMAN & CANOLES, for Appellants.
 Daniel Roger Lahne, KNIGHT, DUDLEY, DEZERN & CLARKE, for Appellee.
 William Edgar Spivey, KAUFMAN & CANOLES, for Appellants Money Point Diamond Corp., Money Point Land Holding Corp., Jacobson, and Ginsburg;
 Glenn Alton Huff, Timothy M. Richardson, HUFF, POOLE & MAHONEY, P. C., for Appellant Copeland.
 Montgomery Knight, Jr., Lawrence A. Dunn, KNIGHT, DUDLEY, DEZERN & CLARKE, for Appellee.
 E.D.Va.
 AFFIRMED.
 Before ERVIN, Chief Judge, and HAMILTON and WILLIAMS, Circuit Judges.
 PER CURIAM:
 
 OPINION
 
 1
 In this declaratory judgment action, Money Point Diamond Corporation (Money Point) appeals the judgment entered by the district court after a bench trial, finding that the contract required Money Point to indemnify Union Corporation (Union) for certain clean-up environmental liabilities. Finding no error, we affirm.
 
 
 2
 * This case involves a dispute over the interpretation of an indemnification clause in a contract for the sale of certain assets and the assumption of designated liabilities of a scrap metal business. Union originally acquired the business (Jacobson Metal or the Division) in 1970 from the Jacobson family. Several of the family members continued working in the Division for several years after the sale.
 
 
 3
 The operations of the Division involved buying and selling ferrous and non-ferrous scrap metals as well as used batteries which contained salvageable scrap metal. Specifically, the Division purchased such metals, and in some instances, altered the metals by cutting, shearing, bailing or other methods before storing and reselling them. In other instances, the Division purchased the metals and stored them unaltered until the Division could procure a purchaser. The Division also bought used batteries and sold them to recyclers who would then process the used batteries to extract scrap metal.
 
 
 4
 In 1985, as a result of the potential environmental liabilities from Union's heavy industries, Union began seeking potential buyers for the Division. In August 1985, Money Point learned of Union's desire to sell the Division. One of the constituents of Money Point was Fred Jacobson, a former owner of the Division. On August 16, 1985, Jacobson met in New York with Robert Sable, a top level manager of Union, to discuss a potential sale. During that meeting, the parties agreed to the basic terms of the asset sale which were to be detailed in a binding letter agreement.
 
 
 5
 Upon returning from New York, Money Point consulted its attorney, Allen Buffenstein. Buffenstein then negotiated with the Union lawyers regarding the specific terms of the letter agreement. During the course of negotiations, Buffenstein informed Money Point that he found the proposed indemnification clause unusual in the context of an asset purchase. Specifically, Buffenstein told Money Point that he "was concerned about environmental protection issues ... with respect to the inventory [and] the land." (Joint Appendix (J.A.) 1235). Because of this concern, Buffenstein also had some research conducted into the scope of environmental liabilities. However, because Union insisted that the language of the indemnification agreement was non-negotiable, Money Point informed Buffenstein to refrain from negotiating the contract "to any great extent" because they wanted to buy the assets. Id.
 
 
 6
 On August 20, 1985, the parties again met to discuss the specific terms of the deal. During this meeting, Money Point insisted on including two provisions in the contract to minimize its potential environmental liability. These provisions encompassed assurances from Union that: (1) it had received no physical notice of any environmental violations in the past year, and (2) it would not seek indemnification for two pending lawsuits.
 
 
 7
 On August 29, 1985, the parties executed their contract for the sale of certain Division assets and assumption of related liabilities. In addition to the provisions previously described, other relevant parts of the contract provided:
 
 Section 1.01
 
 8
 ....
 
 
 9
 Except as specifically listed as the Assets to be acquired, Seller shall retain all of the other and remaining assets of the Division including but not limited to ... all assets of every type and description not in any way associated with this Division....
 
 Section 8.01
 
 10
 ....
 
 
 11
 Buyer shall, after closing, be solely liable and responsible for and shall indemnify and hold Seller harmless from all loss, damages, claims, actions, suits, costs and expenses incurred or in any way related to the Assets to be Acquired, their condition and/or the processing of inventory from any and all sources whether related to events, conditions or occurrences arising or accruing before or after Closing and regardless of whether based on statute, regulatory or common law....
 
 Section 8.02
 
 12
 ....
 
 
 13
 In order to insure the financial capability of [Buyer] to perform its obligations under this Agreement, Buyer shall have and maintain consolidated Tangible Net Worth of not less than $20 Million....
 
 
 14
 (J.A. 166). In addition, the contract required Money Point to pay $2.7 million in cash, all up front.[1] On the same day, the deal closed.
 
 
 15
 On July 13, 1988, Union received notice from the United States Environmental Protection Agency (EPA) that it was a"Potentially Responsible Party" (PRP) under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA)s 107(a)(3), relating to the Division's "arrang[ing] for[the] disposal of hazardous substances [batteries]" at a contaminated facility-the Tonolli Corporation site in Pennsylvania. 42 U.S.C § 9607(a)(3). Specifically, Union's potential liability arose out of the contamination of the Tonolli site by batteries containing lead which were shipped from the Division to the Tonolli site for recycling. On December 24, 1991, Union received a similar notice from the EPA regarding environmental liability resulting from disposal of batteries at the C & R Battery Recycling site in Richmond, Virginia.[2] All shipments giving rise to Union's potential liability occurred prior to Money Point's purchase of certain Division assets in 1985.
 
 
 16
 In preparing their response to this notice, Union requested Money Point to produce several records of the Division. At the same time, a representative of Money Point (Ginsburg) indicated that, although the indemnification provision in the contract might compel Money Point to indemnify Union for the C & R site, he did not believe that this was the intent of Money Point at the time they agreed to it. (J.A. 1240).
 
 
 17
 On May 16, 1991, Union formally requested indemnification from Money Point for the Tonolli and C & R environmental liabilities. After Money Point refused, the parties filed cross actions for declaratory judgments, requesting the district court to interpret the scope of the indemnification provision.
 
 
 18
 After the parties filed cross motions for summary judgment, the district court found the indemnity provision to be ambiguous and denied both motions. Specifically, the district court reasoned that there was no plain meaning of the phrase "processing of inventory" within the indemnity provision. Thus, the district court decided that the parties should introduce extrinsic evidence to assist the district court in interpreting this clause.
 
 
 19
 Thereafter, Money Point sought to compel Union to produce documents relating to the unsuccessful negotiations between Union and several other potential buyers for the Division, including Peck Iron & Metal Co. (Peck), Gordon Douglas and Lavino Shipping. After a hearing, the magistrate judge denied this request. Subsequently, Money Point subpoenaed documents from Peck regarding the failed negotiations with Union. At trial, Money Point attempted to admit this evidence to illustrate Union's intent in drafting the indemnification provision. The district court excluded such evidence on the grounds of relevance.
 
 
 20
 At trial, Money Point argued that the contract for the sale of certain Division assets did not require it to indemnify Union for liabilities arising from the disposal of batteries which occurred before the sale of the Division. Instead, because the contract only transferred select assets, Money Point interpreted the indemnity provision to include only those liabilities arising from assets that were part of the inventory when Money Point purchased the Division. In response, Union claimed that the indemnity provision transferred to Money Point all environmental liabilities arising from the Division's operation before or after the sale.
 
 
 21
 At the conclusion of trial, the district court interpreted the phrase "processing of inventory" within section 8.01 of the contract to require Money Point to indemnify Union for the liabilities in question. In reaching this conclusion, the district court relied primarily on six evidentiary facts, which were:
 
 
 22
 (1) Union's desire to rid itself of all potential environmental liabilities suggested that at least Union intended to transfer the liabilities in question;
 
 
 23
 (2) Buffenstein's expressed concern over the unusual indemnity provision and Money Point's response that Buffenstein should not try to negotiate the terms of the contract to a great extent indicated that Money Point was eager to purchase the Division on Union's terms;
 
 
 24
 (3) Money Point's confidence about its knowledge of the Division's operations and any resulting environmental liabilities coupled with Money Point's concern about potential liabilities arising during the short time in which no Money Point individual was involved with the operations of the Division implied that Money Point did not have much concern about potential environmental liabilities except those which might have arisen while no Money Point constituent worked for the Division;[3]
 
 
 25
 (4) Under Money Point's interpretation of the indemnity provision, the two provisions which Money Point insisted on would have been superfluous because the liabilities referred to in those provisions did not relate to the assets to be acquired;
 
 
 26
 (5) The financial assurances Money Point gave to Union even though the sale of the Division was all cash up front reflected Union's desire to insure that Money Point had the capacity to indemnify for potential environmental liabilities;
 
 
 27
 and
 
 
 28
 (6) Ginsburg's statement that, although the indemnity provision might compel Money Point to indemnify Union for the liabilities in question, that was not Money Point's intent. This statement indicated that Money Point was aware that the indemnity provision might require it to indemnify Union for the environmental liabilities in question.
 
 
 29
 The district court found these facts established, by a preponderance of the evidence, that the parties intended Money Point to indemnify Union for the environmental liabilities in question. However, the district court expressly refused to adopt either interpretation of the phrase "processing of inventory" offered by the parties or to interpret the contract as "a general transfer of all liabilities of the division to ... Money Point...." (J.A. 1242).
 
 
 30
 Money Point now appeals.
 
 II
 
 31
 In its appeal, Money Point first contends that the district court erred when it interpreted the terms of the contract. Money Point offers two theories to support this argument. We find neither theory persuasive and discuss our reasons with respect to each theory separately.
 
 
 32
 * Money Point first argues that the indemnity provision in section 8.01 of the contract unambiguously precludes any indemnification by Money Point for the environmental liabilities in question. Money Point reasons that the plain meaning of "processing of inventory" within the indemnity provision only requires Money Point to indemnify Union for acts done to prepare the inventory for sale. Because the environmental liabilities in question resulted from Union's sale of inventory to contaminated facilities, Money Point concludes that the express terms of the indemnification provision clearly excludes such liabilities.[4] We disagree. When interpreting a contract, a court's first duty is to determine whether the contract is ambiguous. Such a determination is a question of law, not fact. Wilson v. Holyfield, 313 S.E.2d 396 (Va. 1984). Virginia law provides several principles to guide this determination. First, Virginia law provides that "contracts are not rendered ambiguous merely because the parties disagree as to the meaning of the language employed by them in [the writing]." Id. at 398, citing ManssOwens Co. v. Owens & Son, 105 S.E. 543, 547 (Va. 1921). Second, Virginia law precludes a court from relying on extrinsic evidence to create an ambiguity in the writing. Amos v. Coffey, 320 S.E.2d 335, 338 (Va. 1984). Instead, "an ambiguity exists when [the] language [in the writing] admits of being understood in more than one way or refers to two or more things at the same time." Berry v. Klinger, 300 S.E.2d 792, 796 (Va. 1983). Only after the court determines that the contract is ambiguous as a matter of law, can extrinsic evidence regarding the intent of the parties be admitted to assist in interpreting the contract. Winn v. Aleda Construction Co., 315 S.E.2d 193, 194 (Va. 1984).
 
 
 33
 According to these principles, we believe the district court properly found the indemnity provision ambiguous and, therefore, admitted extrinsic evidence to assist in interpreting that provision. In reaching this conclusion, we note that the liability for which Union seeks indemnity does not stem from the sale of inventory, but rather Union's "arrang[ing] for [the] disposal ... of hazardous substances [i.e., inventory]" at contaminated off-site facilities. CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3). In determining whether the plain wording of the contract requires Money Point to indemnify Union for such a liability, this court must examine section 8.01 of the contract, which provides, in relevant part:
 
 
 34
 buyer shall, after closing, be solely liable and responsible for and shall indemnify and hold seller harmless for all loss, damages, claims, actions, suits, costs and expenses incurred or in any way related to the assets to be acquired, their condition and/or the processing of inventory from any and all sources whether related to events, conditions or occurrences arising or accruing before or after closing and regardless of whether based on statute....
 
 
 35
 (J.A. 908).
 
 
 36
 As the district court noted, the use of "and/or" immediately preceding the phrase "processing of inventory" suggests that Money Point must indemnify Union for two categories of liabilities: (1) those arising from the assets to be acquired and (2) those resulting from the processing of inventory. In determining the scope of liabilities depicted in the phrase "processing of inventory," resorting to the dictionary is helpful. Webster's dictionary defines the verb "to process" as: "to subject to a particular method, system, or technique of preparation, handling or other treatment designed to effect a particular result...." Webster's Third New International Unabridged Dictionary 1808 (14th ed. 1966) (emphasis added). Under this definition, it is clear that "processing" could mean the preparation for sale (as argued by Money Point). However, because the Division purchased used batteries for their scrap metal value, the "inventory" depicted in "processing of inventory" could encompass scrap metal. Under this interpretation, the "processing" of that "inventory" would include the disposal of used batteries at recycling facilities, i.e., "a particular method or system of handling," for the extraction of scrap metal, i.e., "designed to effect a particular result." Because the phrase"processing of inventory" in the indemnification provision "refers to two or more things at the same time," we believe the district court properly found the provision to be ambiguous. Berry v. Klinger, 300 S.E.2d at 796. Because the indemnity clause was ambiguous, the district court also properly admitted extrinsic evidence to assist in interpreting that provision.
 
 
 37
 The district court's proper admission of extrinsic evidence does not, however, end our inquiry. We must still consider whether the district court erred when it interpreted the indemnity clause to require Money Point to indemnify Union for the liabilities in question. We conclude the district court committed no such error.
 
 
 38
 The ultimate objective in using extrinsic evidence to interpret a contract is to ascertain the parties' intent. Worrie v. Boze, 62 S.E.2d 876, 880 (Va. 1951). In addition, "what the parties intended ... is a question of fact to be determined from the circumstances surrounding the making of the contract...." Richmond, Fredericksburg and Potomac Railroad Co. v. Sutton Company, Inc., 238 S.E.2d 826, 830 (Va. 1977). Finally, "the determination of the parties' intent is a factual finding that will not be reversed by an appellate court unless it is clearly erroneous." Stock Equip. Co. v. Tennessee Valley Auth., 906 F.2d 583, 591 (11th Cir. 1990) (citation omitted). For the district court's decision to qualify as clearly erroneous, it"must strike us as more than just wrong or probably wrong; it must ... strike us as wrong with the force of a five week-old, unrefrigerated dead fish." United States v. Perry, 908 F.2d 56, 58 (6th Cir.), cert. denied, 498 U.S. 1002 (1990) (quotation omitted).
 
 
 39
 Applying these principles to the present case indicates that the district court's interpretation must withstand scrutiny. The evidentiary facts relied on by the district court create an image that Money Point was eager to buy the Division without much negotiation, and was confident that their knowledge of the Division's operations would protect them from any unforeseen liabilities. This image, coupled with Union's clear desire to divest itself of potential environmental liabilities, suggests that the parties intended to transfer the environmental liabilities in question. Under such a scenario, we believe the phrase "damages ... in any way related to ... the processing of inventory" could reasonably be interpreted to include the liabilities resulting from the disposal of used batteries to recycling facilities for the extraction of scrap metal. (J.A. 166) (emphasis added). Thus, we cannot say that the district court's interpretation of the parties' intent was clearly erroneous.
 
 B
 
 40
 Money Point next contends that the district court erred by failing to interpret the phrase "processing of inventory." In support, Money Point cites the district court's statement:
 
 
 41
 The Court notes that it is not adopting the interpretation of the term 'processing of inventory' ... as offered by either party.... Neither should this opinion be read to declare that the indemnification clause ... accomplished a general transfer of all liabilities of the division....
 
 
 42
 (J.A. 1242). Because Virginia law requires a court to "declare what the instrument itself says ...," Money Point concludes that the district court violated Virginia law by refusing to expressly interpret the exact meaning of the indemnification provision. Ames v. American Nat'l Bank, 176 S.E. 204, 216 (Va. 1934). We disagree.
 
 
 43
 In interpreting a contract through extrinsic evidence, the court's ultimate goal is to ascertain the intent of contracting parties. Worrie, 62 S.E.2d at 880. In ascertaining the intent behind the contract, Virginia law requires a court to "[give] consideration [to] the occasion which gave rise to the contract, the expressed intention of the parties, and the object to be obtained ... as well as the language of the instrument itself...." Southwest Virginia Hospitals v. Lipps, 68 S.E.2d 90 (Va. 1951). Moreover, some courts recognize that they are not limited to the definitions offered by the litigating parties when deter mining contractual intent. See, e.g., Dore v. LaPierre, 226 N.Y.S.2d 949, 951 (Sup. Ct. N.Y. 1962).
 
 
 44
 Applying these principles to the present case reveals that the district court did not err in its interpretation of the phrase "processing of inventory." Specifically, in reaching a determination as to the intent behind the indemnification provision, the district court considered such extrinsic evidence as the circumstances surrounding the contract, the parties' expressed intentions, the object to be obtained and the express language of the contract. After evaluating such factors, the district court concluded:
 
 
 45
 [T]he parties to the [contract] intended that Section 8.01 would serve to compel the Money Point parties to indemnify [Union] for the type of environmental liabilities it may incur relating to the disposal of batteries at the C & R Battery and Tonolli sites....
 
 
 46
 (J.A. 1241). Because the district court expressly ascertained the intent of the parties, and the disputed provision of the contract can be construed to conform to the parties' intent, the fact that the district court did not provide the exact interpretation of the disputed provision does not create reversible error.
 
 III
 
 47
 Money Point next argues that the magistrate court and district court abused their discretion when they prohibited Money Point from discovering, and excluded from evidence, drafts and other notes relating to proposed contracts prepared by Union for the sale of the Division to other prospective buyers. Money Point reasons that such evidence might have assisted in revealing the type of liabilities which Union actually intended to describe in the term "processing of inventory." We disagree.
 
 
 48
 When determining whether particular information is discoverable or admissible, the district court must consider whether such information is "relevant." The Supreme Court defines relevance for discovery purposes as any material "that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978). Federal Rule of Evidence 401 defines "relevant" for admissability purposes as "having any tendency to make the existence of any fact that is of any consequence to the determination of the action more ... or less probable." In determining whether evidence qualifies as relevant for discovery or admissability purposes, the district court has broad discretion. Ardry v. United Parcel Service, 798 F.2d 679, 682 (4th Cir. 1986). Thus, a district court's determination that a particular piece of evidence was irrelevant may be overturned only upon a clear showing of abuse of discretion which affects substantial rights. Marquis v. Chrysler Corp., 577 F.2d 624, 636 (9th Cir. 1978).
 
 
 49
 In the present case, we believe the district court did not abuse its discretion when it prohibited discovery of and excluded from evidence the items in question. Although the other contracts might have used the same term "processing of inventory," that does not suggest that the intent behind this term would be consistent for each contract. As both parties concede, each respective buyer negotiated separately over the liabilities it would indemnify against if it purchased particular assets of the Division. Thus, even though the terms within the various contracts may have been similar, the intent behind the similar terms in each contract would differ depending on the particular negotiations. Moreover, because Union negotiated separately with each buyer, the drafts of the potential contracts with these buyers cannot be considered as part of the circumstances surrounding the transaction between Money Point and Union. Accordingly, we think the evidence which Money Point sought to discover and admit at trial was not relevant and was properly excluded.
 
 IV
 
 50
 For the reasons stated herein, we affirm the decision of the district court.
 
 AFFIRMED
 
 
 [1]
 In earlier negotiations, Union rejected Money Point's proposal for a $500,000 promissory note as part of the purchase price
 
 
 [2]
 The Tonolli and C & R sites were not owned by the Division
 
 
 [3]
 The district court developed this evidentiary fact from the testimony of Kenneth Giannantonio, the Union attorney for much of the negotiations leading to the sale of the Division. Specifically, Giannantonio testified regarding the negotiations:
 Basically, what they [Money Point] said, that we [Money Point] know more about this business than you do and certainly than your client [Union] does. We own[ed] this business. We operated this business before your client ... so ... there is no one else that [Union] will be able to find that would be willing to assume the exposure ... [and] environmental liabilities that [Money Point was] willing to assume. They then said but we have a problem. And that problem was although we are familiar with the operation ... there was some period of time, a year or two years, when Union owned it and one of the Jacobsons was not present on site. And [Money Point] said ... we want assurance that during that period of time some marshal, ... did not come up to [Union representatives] and serve[them] with notice of a violation we don't know about.
 (J.A. 1237).
 
 
 [4]
 To illustrate the purported distinction between "processing" and "selling" inventory, Money Point points to section 2.10(a) of the contract which states:
 All executory contracts for the purchase of new inventory and the sale of processed inventory are identified in Exhibit "H" attached hereto and made a part of this agreement.
 J.A. at 898 (emphasis added). Because a court should construe the same terms consistently throughout the contract and section 2.10(a) clearly distinguishes between processed and sold inventory, Money Point concludes that the indemnification provision in section 8.01 excludes indemnity for liability arising out of the sale of inventory. See, e.g., National Ropes, Inc. v. National Diving Serv., 513 F.2d 53, 58 (5th Cir. 1978) (courts should consistently define the same terms appearing in different provisions of a contract).