574 So.2d 579 (1990)
Ras KEYS and Pauline Keys
v.
REHABILITATION CENTERS, INC.
07-CA-59114.
Supreme Court of Mississippi.
December 12, 1990.
*580 Matthew Harper, Jr., Harper Braham & Associates, Laurel, for appellants.
*581 John S. Knowles, III, Bates Brantley & Knowles, Jackson, Eugene C. Tullos, Tullos & Tullos, Raleigh, for appellee.
Before HAWKINS, P.J., and ROBERTSON and BLASS, JJ.
ROBERTSON, Justice, for the Court:

I.
This is a suit for indemnity, contractual variety. A shareholder in a close corporation sold his interest to his co-shareholder, and the selling shareholder agreed to hold the corporation and others harmless for one-half of outstanding contingent liabilities, one of which was an uninsured tort claim arising out of the death of a child. The corporation later settled the wrongful death claim and sued the selling shareholder for his pro-rata share.
We hold the indemnity agreement created a valid and subsisting obligation in favor of the corporation. The trial court failed to submit to the jury the question whether the corporate indemnitee paid under compulsion, and we reverse and remand that this issue may be appropriately litigated.

II.
Rehabilitation Centers, Inc. is a Mississippi corporation organized in 1975. Its principal shareholders are Dr. James Otis Stephens, his wife, together with Joseph Lawrence Stephens, their son. The corporation does business in Simpson County, Mississippi, where it operates a residential center for handicapped children known as Millcreek. Rehabilitation Centers, Inc. (sometimes "Millcreek" or merely "the corporation") was the Plaintiff below and is the Appellee here.
Ras Keys and Pauline Keys are husband and wife and were shareholders in the corporation when it was formed. Ras Keys is a life-time resident of Simpson County and is the pastor of Holy Bible Church in Magee, Mississippi. Keys and Dr. Stephens first met in 1969 and were involved in several ventures before forming the corporation, of which at all relevant times Keys was the president. Keys also served as the administrator for the Millcreek school and residential center.
The life and death of young William B. Killen forms an important backdrop. William was an autistic child who was enrolled in Millcreek in 1976 when he was five years old. On Good Friday of 1982  April 9, to be exact  William became separated from the other students and was later found in a nearby creek, drowned.
Months before young William's death, Ras Keys had begun negotiating with Dr. Stephens for the sale of the Keyses' interest in Millcreek to Dr. Stephens and his son. The Keyses and the Stephenses were represented by separate lawyers. On May 13, 1982, just a little over a month after William's death, the negotiations bore fruit formally memorialized in a written purchase agreement, wherein Dr. Stephens and his son offered to purchase the Keyses' interests in the corporation and several related businesses, partnerships and the like. Ras Keys and Pauline Keys formally responded with their formal written acceptance. The parties designated July 1, 1982, as the date for closing, their primary concern timewise being that approval for the sale would have to be secured "from the Mississippi Health Care Commission and other regulatory authorities."
The purchase agreement identified each property, real, personal and mixed, the Keyses would be selling to the Stephenses and further described the purchase price, terms of payment, and included other miscellaneous provisions. Of particular concern, Article II, Section 5, provided:
Sellers shall assume and be responsible for one-half (1/2) of any contingent liability arising out of any act or omission occurring prior to June 30, 1982, which arises out of the operation of Partnership or Corporations; however Corporations shall pay all legal fees incurred in defense of said acts or omissions. Sellers further agree to remain as co-signers with Purchasers on mortgages payable to Standard Life Insurance Company, First National Bank and State Guaranty Bank.
*582 On July 1, 1982, the Stephenses and the Keyses, together with their lawyers, convened for the closing of the sale. The lawyers had prepared a number of instruments to be signed at closing, including deeds to several properties and a bill of sale to be executed by the Keyses, promissory notes and a deed of trust to be executed by the Stephenses, and finally, pursuant to Article II, Section 5, a separate indemnity agreement[1] which was executed by the Keyses and delivered to the Stephenses.
The indemnity agreement is the subject of the present action, and, as much is made of its differences in verbiage from the terms of the purchase agreement, two points should be noted. First, the indemnity agreement provides that the Keyses obligated themselves
... to indemnify and hold harmless said corporation and Dr. James Otis Stephens.
The purchase agreement is not inconsistent. It simply did not specify in whose favor the indemnity ran, providing merely that the Keyses would be responsible for one-half of any contingent liability arising out of any act or omission of the corporation prior to June 30, 1982. Second, the indemnity agreement provided that the Keyses would be responsible for one-half "of any contingent liability, action, proceedings, claims, or demands," whereas the purchase agreement merely provided that the Keyses would be responsible for one-half of any "contingent liability."
In any event, the sale was closed on July 1, 1982, without untoward event, and all was well until November 4, 1982, when the mother of William B. Killen filed an action for the wrongful death of her son in the Circuit Court of Simpson County, naming Rehabilitation Centers, Inc., and others as defendants. The Killen complaint charged that the corporation and Ras Keys, as its president and administrator, were responsible for the safety of William while he was enrolled at Millcreek and that they were negligent and careless in their duties, in consequence of which William met his death. Young Killen's mother also named Keys as a defendant and a party having liability by reason of his obligation to indemnify the corporation incident to the sale of his interest to Dr. Stephens and his son. The complaint demanded $1,500,000.00 in damages plus costs.
Of great concern to all was the fact that none of the defendants had liability insurance covering the claim for the death of the Killen boy.
Pre-trial matters proceeded apace in the wrongful death action and, in time, Millcreek saw that it had considerable exposure and decided the suit should be settled. Through counsel Millcreek contacted Ras Keys and demanded that he honor his indemnity *583 obligations and consent to the settlement and participate therein. Keys at all times steadfastly refused, maintaining that Millcreek was without negligence and that the action could be successfully defended at trial. Notwithstanding, Millcreek effected and consummated a settlement of the wrongful death claim paying William Killen's survivors some $60,000.00. On November 30, 1983, the Circuit Court of Simpson County entered an agreed order of dismissal of the Killen wrongful death claim.
For some time thereafter, Millcreek endeavored to obtain a contribution from the Keyses. These demands were refused and finally, on June 22, 1984, Millcreek filed the present action in the Circuit Court of Simpson County, Mississippi, asserting that Ras and Pauline Keys were liable under the indemnity agreement and demanding damages by reason thereof. After considerable pre-trial wranglings, the matter was called for trial on May 20, 1987, and in due course the jury returned a verdict that the Keyses were indeed liable to Millcreek under indemnity for one-half the wrongful death settlement, or the sum of $30,000.00, and final judgment was entered thereon. The Keyses moved the Circuit Court for judgment notwithstanding the verdict or, in the alternative, for a new trial. On September 23, 1987, the Circuit Court entered its order denying the motion. The Keyses now appeal to this Court urging reversal.

III.
Formalistically, the Keyses argue that their indemnity obligations are governed by the May 13, 1982, purchase agreement and not by the indemnity agreement delivered at closing on July 1, 1982, and from this they assert a number of points suggesting reversal. The short answer is that their fundamental premise is wrong. The purchase agreement by its terms was both precatory and obligatory. It obligated the parties to buy and sell respectively, subject to conditions, but it was not the sale itself. By its terms, it contemplated a closing a little over six weeks later, or whenever the necessary administrative approvals were obtained. At closing the terms of the purchase agreement merged into the closing documents: the deeds, bill of sale, promissory notes, and the indemnity agreement. The closing documents themselves subsumed the comparable provisions of the purchase agreement. West v. Arrington, 183 So.2d 824, 827 (Miss. 1966); Brown v. King, 214 Miss. 437, 58 So.2d 922, 923 (1952).
To be sure, obligations and rights conferred by the purchase agreement remained viable according to their terms and to the extent not supplanted by the closing documents. Knight v. McCain, 531 So.2d 590, 594-95 (Miss. 1988). But the matter is different with respect to those rights and obligations of the purchase agreement where the parties delivered consummating agreements at closing. The purchase agreement served as a measure for the closing documents. Had one party or the other sought to secure execution of a note, a deed  or an indemnity agreement  not in conformity with the purchase agreement, the other could of right have complained. If the Stephenses had tendered to the Keyses an indemnity agreement that varied from the provisions of the purchase agreement, the Keyses of right may have complained and if, in fact, the indemnity agreement had varied substantially from the Keyses' original obligation, they could have refused to close the sale with impunity. On the other hand, it was incumbent upon them to object at that time and before signing the indemnity agreement and, absent fraud or duress which are not charged here, they will not be heard to object now.
Pressing formalism to the extreme, the Keyses argue that the July 1 indemnity agreement is not binding upon them because it is a modification of the original purchase agreement and not executed with the same formalities as the original, that is, the Stephenses did not sign the indemnity agreement. This makes about as much sense as saying that the deeds and bill of sale are invalid because the Stephenses, as buyers, did not execute them or as saying that the promissory notes are invalid because the Keyses, as holders, did *584 not sign them. Nor does it matter in what order the various documents were signed. Where parties to a sales transaction assemble for a conventional closing, there are always a number of papers to be signed, and the law will view the closing as a single transaction, it being wholly irrelevant who signed what in which order or sequence.
Straining further, the Keyses argue that the sale was between themselves and the Stephenses. They say the corporation was a stranger to the transaction and could acquire no rights or benefits, either via the purchase agreement or the closing documents. The point is specious. The corporation was the subject of the entire transaction. It assumed a substantial obligation when it executed a $400,000.00 note payable to Ras Keys and delivered that note at closing, and was certainly not a stranger in that sense. Having so obligated itself, the corporation understandably would expect that it be a beneficiary of the indemnity. As a matter of law, there is no question but that, incident to one shareholder's sale of stock to another shareholder, the buyer may secure the seller's indemnity running in favor of not only himself but the corporation as well, and any such indemnity may of right be enforced by the corporation according to his tenor. To the present facts common sense suggests the Stephenses as buyers would want the indemnity to run in favor of whatever legal entity within the Millcreek group might ultimately be saddled with liability, particularly in a close corporation, and facing the possibility of an uninsured loss.
Millcreek sued on the indemnity agreement. It attached that agreement to its complaint and charged that the Keyses were liable upon it. For reasons not entirely clear, the Circuit Court rejected this theory of the case and submitted the case to the jury on the purchase agreement only. In this the Court erred. We hold on these facts that Millcreek was a beneficiary of the indemnity agreement of July 1, 1982, and that agreement constitutes a binding and subsisting obligation of Keys according to its terms.

IV.
The Keyses next argue that, even if the indemnity agreement is enforceable, they have no liability in the premises because Millcreek's $60,000.00 payment in settlement of the Killen wrongful death case was voluntary and not made under compulsion. Here the Keyses' legal premises are essentially correct.
In Southwest Mississippi Electric Power Association v. Harragill, 254 Miss. 460, 468, 182 So.2d 220, 223 (1966), this Court held that to recover indemnity the indemnitee must allege and prove that he was legally liable to the person injured and, consequently, paid under compulsion; otherwise, the payment was in law a voluntary one for which there could be no recovery in an indemnity action. Bush v. City of Laurel, 215 So.2d 256, 260 (Miss. 1968), proceeds on the same premise, holding that a payment made after liability has been established is one made under compulsion. Hopton Building Maintenance, Inc. v. United Parcel Service, Inc., 559 So.2d 1012, 1014 (Miss. 1990) is to like effect. Maryland Casualty Co. v. R.H. Lake Agency, Inc., 331 F. Supp. 574 (N.D.Miss. 1971), perceptively applies Mississippi law to the point.
Under the rule of these cases, predicate to recovering indemnity from the Keyses, Millcreek was obligated to prove that it was liable for the Killen boy's death. On the other hand, indemnifying parties such as the Keyses have no right to insist that their indemnitee endure the hazards of trial by jury as a condition for enforcing the indemnity agreement. See Mississippi Farm Bureau Mutual Insurance Co. v. Garrett, 487 So.2d 1320, 1323 (Miss. 1986). Absent some contractual provision to the contrary  and we find none here  Millcreek was entitled to use its own good judgment and effect such settlement of the wrongful death claim as it deemed prudent, provided only that when proceeding to enforce the indemnity agreement that it prove that it was indeed liable to the Killen survivors and that the amount paid in settlement was reasonable. An indemnitee *585 such as Millcreek cannot simply settle and then send the indemnitor his share of the bill. It must, in the words of our rule, prove that it paid under compulsion and no case more perceptively illustrates this point than Maryland Casualty Co. v. R.H. Lake Agency, Inc., noted above.
Millcreek attempted to try the case as a conventional action for indemnity. The Circuit Court would not allow such and submitted the case to the jury on a theory which coalesced the source of the Keyses' obligations and their content. Instruction No. P-6, as edited by the Court, told the jury:
The Court instructs the jury that if you believe by a preponderance of the evidence in this case that it was the intent of the parties to the Purchase Agreement that Ras Keys and Pauline Keys be liable to the Plaintiff for one-half of the sum paid to settle the claims arising out of the death of William Killen, regardless of whether or not Ras Keys and Pauline Keys agreed to said settlement; then it is your sworn duty to return a verdict for the Plaintiff.[2]
As with other actions on written instruments, we are concerned not so much with what the parties intended as with what they said. Estate of Hensley v. Estate of Hensley, 524 So.2d 325, 327 (Miss. 1988). More accurately, we may search for the parties' intent most profitably in what they have said, UHS-Qualicare, Inc. v. Gulf Coast Community Hospital, 525 So.2d 746, 754 (Miss. 1987), and there can be no doubt that, without hint of fraud, duress or other vitiating misconduct, Ras and Pauline Keys have said that they will
... be responsible for one-half of any contingent liability, actions, proceedings, claims or demands arising out of any act or omission occurring prior to June 30, 1982.
The Killen wrongful death claim falls within these terms. We do not see in the language of the indemnity agreement, however, any provision that would override our general rule that an indemnitee must prove payment under compulsion and reasonableness in amount before he may recover. See Hopton Building Maintenance, Inc., 559 So.2d at 1014. Our problem is that these issues were never submitted to the jury, no doubt because of the form in which the Court below conceived the matter.
The record before us reflects substantial evidence that Millcreek did indeed have liability for the death of young William Killen. William had been at Millcreek for over five years. He had been diagnosed as suffering from infantile autism. Millcreek certainly understood what this meant in terms of the care and security William needed. The record reflects that he had run away on prior occasions. Millcreek had classified William as a "runner," as a child who had to be carefully watched, and indeed, on occasion tethered, for his own safety.
While it is not completely clear exactly what happened on Good Friday morning of 1982, there is substantial evidence that William was left unattended and managed to crawl under a fence and get into the nearby creek, where he drowned. A combined consideration of the duties Millcreek assumed to a child such as William, Millcreek's familiarity with William and his disability, his behavior and his propensities, coupled with the fact that he appears to have been left unattended, suggests that *586 Millcreek may well have had liability in the premises. A $60,000.00 settlement in a wrongful death case such as this does not strike us as outrageous in amount.
On the other hand, it is possible Millcreek may have been able to defend successfully had the Killen case gone to trial. Ras Keys insists that the area where William was playing was fenced and that he had no reason to expect that William would be able to climb under a fence and get into the creek. No doubt there are other factors that could have been presented by way of defense at trial. The evidence is hardly sufficient that we may hold on the present record as a matter of law that Millcreek had liability in the Killen wrongful death action.
Given the law of this state regarding indemnity and the fact that the rules of our positive law have not been modified by contract, we may affirm the judgment below only if we may find it undergirded by a finding that Millcreek made a reasonable payment and did so under compulsion. Where, as here, the evidence is conflicting, we search for jury-made findings aided by proper instructions. We find none. Herein lies the rub. The payment under compulsion reasonable amount theories were not submitted to the jury, and there is no way in candor we can imply such findings from the way in which the jury did receive and consider the case. Under the circumstances, we may only reverse.

V.
By way of summation, we hold that the indemnity agreement executed by Ras Keys and Pauline Keys on July 1, 1982, created a valid obligation that subsists to this day and is wholly enforceable according to its terms, subject to the positive law of this state regarding indemnity. We hold further that the corporate entity in whose favor the agreement runs may of right enforce it. On the other hand, Millcreek may only recover indemnity if it proves that it paid under compulsion, as that concept is defined in our law of indemnity, and that the amount it paid was reasonable. We reverse and remand for further proceedings consistent with this opinion, enjoining one and all that nothing said here suggests how we think the issues still for trial should be decided.
REVERSED AND REMANDED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, SULLIVAN, ANDERSON, PITTMAN and BLASS, JJ., concur.
NOTES
[1] In its entirety, and in language we find quite ordinary, the Indemnity Agreement reads:

INDEMNITY AGREEMENT
We, the undersigned, do hereby agree to assume and be responsible for one-half of any contingent liability, actions, proceedings, claims, or demands arising out of any act or omission occuring (sic) prior to June 30, 1982, which arises out of the operation of KEYS/STEPHENS PARTNERSHIP, REHABILITATION CENTERS, INC., MILLCREEK SCHOOLS, INC., or MILLCREEK FOUNDATION, INC. Further, the undersigned agree to indemnify and hold harmless said corporations and DR. JAMES OTIS STEPHENS, and JOSEPH LAWRENCE STEPHENS for one-half of any damages that might accrue. It is distincly (sic) understood and agreed that the corporations named above shall pay all legal fees incurred in the defense of any claims made against said corporations.
We, the undersigned, further agree to remain as co-signors with Dr. James Otis Stephens on mortgages payable to Standard Life Insurance Company, First National Bank, and State Guaranty Bank, said deeds of trust being incurred in the operations of KEYS/STEPHENS PARTNERSHIP and the above named corporations.
WITNESS OUR SIGNATURES, this the 1st day of July, 1982.
 /s/ Ras Keys 
 RAS KEYS
 /s/ Pauline Keys 
 PAULINE KEYS
SWORN TO AND SUBSCRIBED BEFORE ME, this the 1st day of July, 1982.
 /s/ Margaret Ponder 
 NOTARY PUBLIC
My Commission Expires:
Sept. 8, 1984 
Of course, the agreement technically calls for contribution, not indemnity. To avoid confusion, we will stick with the terms the parties have used.
[2] At the request of the Keyses, an essentially identical instruction was given as follows:

The Court instructs the jury that the burden is upon the Plaintiff to prove, by a preponderance of the evidence, the essential elements of its case; and if Plaintiff fails to prove any one or more of the essential elements of its case by the greater weight of the credible evidence in this cause, then your verdict shall be for the Defendants.
The Court further instructs the jury that the element of Plaintiff's case, which Plaintiff must prove by a preponderance of the evidence, is:
It was the intent of the parties to the Purchase Agreement that Ras Keys and Pauline Keys be liable to Plaintiff for 1/2 the sum paid to settle the Killen suit, regardless of whether or not Ras and Pauline Keys agreed to said settlement; and
If Plaintiff fails to prove this element by a preponderance of the evidence, then it is your sworn duty to find for Ras and Pauline Keys.