365 F.3d 263
 ST. PAUL FIRE & MARINE INSURANCE COMPANY, Plaintiff-Appellant,
v.
AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY, Defendant-Appellee, and
TIG Insurance Company; CNA Casualty Company of California, Defendants.
St. Paul Fire & Marine Insurance Company, Plaintiff,
v.
TIG Insurance Company, Defendant-Appellant, and American International Specialty Lines Insurance Company, Defendant-Appellee, and
CNA Casualty Company of California, Defendant.
 No. 02-2360.
 No. 02-2361.
 United States Court of Appeals, Fourth Circuit.
 Argued: January 22, 2004.
 Decided: April 9, 2004.
 
 COPYRIGHT MATERIAL OMITTED ARGUED: Thomas Sykes Schaufelberger, Wright, Robinson, Osthimer & Tatum, Washington, D.C., for TIG Insurance Company. Elizabeth Stanulis Skilling, Harman, Claytor, Corrigan & Wellman, Richmond, Virginia, for St. Paul Fire & Marine Insurance Company. Robert N. Kelly, Jackson & Campbell, P.C., Washington, D.C., for Appellee. ON BRIEF: Paul A. Fitzsimmons, Wright, Robinson, Osthimer & Tatum, Washington, D.C., for TIG Insurance Company. John M. Claytor, Harman, Claytor, Corrigan & Wellman, Richmond, Virginia, for St. Paul Fire & Marine Insurance Company. John R. Casciano, Jackson & Campbell, P.C., Washington, D.C., for Appellee.
 Before WILKINSON, LUTTIG, and TRAXLER, Circuit Judges.
 Reversed and remanded by published opinion. Judge LUTTIG wrote the opinion, in which Judge WILKINSON and Judge TRAXLER joined.
 LUTTIG, Circuit Judge:
 
 
 1
 The instant appeal arises from the settlement of a tort action brought by Terrence Merritt against, inter alia, the owner and the operator of a Virginia resort. Merritt's lawsuit sought damages for an alleged food poisoning he suffered while at the resort. The defendants agreed to settle the action for $4 million, $3 million of which was funded through an interim agreement between three insurance companies: St. Paul Fire and Marine Insurance Company ("St. Paul"), CNA Casualty Company of California, Inc. ("CNA") and American International Specialty Lines Insurance Company, ("AISLIC"). The companies agreed to resolve their coverage and allocation issues after the lawsuit settled.
 
 
 2
 Subsequently, St. Paul filed suit against CNA, AISLIC, and a fourth insurer, TIG Insurance Company ("TIG") (who did not contribute to the settlement), requesting a declaration of the four insurers' respective liability respecting the settlement. St. Paul sought to recover the $1 million it had already contributed, arguing that it had no obligation to cover any portion of the settlement. Exercising diversity jurisdiction, the district court granted AISLIC's motion for summary judgment and denied St. Paul's motion for summary judgment. The court also ordered TIG to pay $1 million plus interest toward the underlying settlement. For the reasons that follow, we reverse and remand.
 
 I.
 A.
 
 3
 In 1989, VMS Lansdowne Limited Partnership ("VMS Lansdowne") and BMC-The Benchmark Management Company ("Benchmark Management") entered into a Master Management Agreement ("MMA") relative to the management and operation of Lansdowne Resort (referred to in the MMA as "the Project"), a resort and conference center in Leesburg, Virginia. According to the MMA, Benchmark Management is the "Operator" of the resort — the "sole and exclusive management company" under the MMA — and VMS Lansdowne is the "Owner." The MMA specifies that all top-level management have to be employees of the Operator, and that "all other employees working in or about the Project shall be employees of a subsidiary of Operator." Benchmark Conference Resorts of Virginia ("Benchmark Conference"), a subsidiary of Benchmark Management, was incorporated for that very purpose.
 
 
 4
 Among its numerous sections, the MMA includes indemnification provisions that require, generally speaking, that VMS Lansdowne indemnify Benchmark Management and its agents from liability arising from ordinary negligence or the like at the Resort, but that the opposite occur as to liability arising from gross negligence, fraud, or willful conduct.
 
 
 5
 The MMA also requires that comprehensive general liability insurance in the amount of $1 million, and excess umbrella liability insurance in the amount of $50 million, be maintained for the project in the name of the Owner and the Operator. Accordingly, VMS Lansdowne purchased insurance policies effective December 1998 from CNA and AISLIC. The CNA general liability policy provides $1 million in primary coverage, and the AISLIC umbrella liability policy provides $50 million of coverage in excess of the CNA policy (collectively, "the CNA/AISLIC line"). Both policies list VMS Lansdowne as a named insured and extend coverage to VMS Lansdowne's "real estate manager." A "named insured endorsement" for the CNA policy listed VMS Lansdowne Development Corp. ("VMS Development"), VMS Lansdowne's subsidiary, and "Lansdowne Resort."
 
 
 6
 Benchmark Management and Benchmark Conference also procured coverage for themselves from St. Paul and TIG. The St. Paul policy provides $1 million in primary coverage, and the TIG policy provides $10 million of umbrella coverage in excess of the St. Paul policy (collectively, "the St. Paul/TIG line"). Notably, each of the four policies includes some form of "other insurance" provision specifying that the policy will serve as excess insurance over (i.e., will not respond until the exhaustion of) any other valid and collectible insurance for damage covered by that policy.
 
 
 7
 Pursuant to the above-mentioned settlement agreement, CNA, AIS-LIC, and St. Paul agreed to resolve all claims against the remaining named defendants: VMS Lansdowne, VMS Development, Benchmark Management, and Benchmark Conference, all of which were alleged to be "jointly and severally liable" by the Merritt complaint. The settlement agreement establishes the named defendants'"collective liability" for the $4 million settlement amount, J.A. 352-53, but explicitly does not resolve the controversy among the insurers as to their ultimate liabilities.
 
 B.
 
 8
 In proceedings before the district court, St. Paul, TIG, and AISLIC filed cross-motions for summary judgment;[1] AISLIC's motion was granted, and St. Paul's and TIG's motions were denied. In its analysis, the district court accepted appellants' argument that the St. Paul/TIG line was procured to provide (and should be accordingly interpreted to provide) coverage only if the CNA/AISLIC coverage lapsed or was exhausted. Because it was undisputed that Benchmark Management was covered under the CNA/AISLIC line by virtue of being VMS Lansdowne's real estate manager, the court concluded that St. Paul and TIG were shielded from any obligation to cover Benchmark Management's liability from the settlement.
 
 
 9
 The court concluded, however, that the same result did not follow for Benchmark Conference. Benchmark Conference was not listed by name in the CNA and AISLIC policies, was not covered simply by virtue of being Benchmark Management's subsidiary, and did not qualify, in the court's view, under any provision in the CNA and AIS-LIC policies. Thus, the court concluded that St. Paul and TIG were Benchmark Conference's primary and excess insurers, and thus were obligated to pay into the settlement.
 
 
 10
 The district court proceeded to allocate the payment of the settlement between the settling parties' insurers. The district court first decided that it was unnecessary to allocate payment between CNA and St. Paul because, as primary insurers of the settling parties, their policy limits ($1 million apiece) would necessarily be exhausted. Then, construing TIG and AISLIC as "concurrent excess insurers," the district court equally divided the remaining $2 million there between. Since TIG had not yet contributed to the settlement, the court ordered TIG to fulfill its assessed obligation, with interest to account for its delay.
 
 II.
 
 11
 St. Paul appeals the district court's order denying its motion for summary judgment and granting AISLIC's cross-motion for summary judgment; TIG appeals the district court's consequent order requiring that it pay $1 million plus interest towards the underlying settlement. We review the grant of summary judgment de novo, affirming "only if there are no material facts in dispute and the moving party is entitled to judgment as a matter of law." Hitachi Credit Am. Corp. v. Signet Bank, 166 F.3d 614, 623 (4th Cir.1999). Because we reverse the district court's grant of AISLIC's motion for summary judgment (and accompanying order of payment directed to TIG), as well as its denial of St. Paul's diametrically opposed motion for summary judgment, in assessing the record evidence — which is undisputed in all material respects — we grant AISLIC the benefit of all reasonable inferences. See Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir.), cert. denied, 540 U.S. 822, 124 S.Ct. 135, 157 L.Ed.2d 41 (2003) (detailing method for treating cross-motions for summary judgment).
 
 
 12
 Each side makes several arguments on appeal. In brief, St. Paul and TIG ("appellants") argue that the district court erred in implicitly rejecting their arguments that Benchmark Conference is insured under the CNA/AISLIC lines as, e.g., VMS Lansdowne's "real estate manager" or because Benchmark Conference did business as "Lansdowne Resort," which is listed as an insured under the CNA policy. For its part, AISLIC defends the district court's division of liability among the four insurers, but on different grounds than that court expressed. But appellants also contend, and we agree, that even if the district court did not err in this regard, VMS Lansdowne is obligated under the MMA to indemnify Benchmark Management and Benchmark Conference for their share of the settlement, an obligation that should be assessed before any conflicts between the policies are resolved. So in the end, we largely disregard the parties' free-standing arguments about the various policies, for this case's resolution is controlled by the MMA's indemnification provisions.
 
 III.
 A.
 
 13
 As might be expected from the above-described facts, the ultimate determination for this court — i.e., the respective liability of each insurer on cross-motions for summary judgment — is not simple. However, because the liability of an insurer is a question of contract stemming from its contractual obligation to cover its insured's liabilities, see, e.g., Hudgins v. Jones, 205 Va. 495, 138 S.E.2d 16, 21 (1964), the logical first step is to determine the respective obligations of the insureds in this case under the settlement. Once that is determined, we must decide how much of the settlement amount to allocate to each party; that is a question of contribution between joint tortfeasors governed by the law of Virginia, where the alleged tort occurred. See Buchanan v. Doe, 246 Va. 67, 431 S.E.2d 289, 291 (1993). Only after completing these initial steps do we determine the insurers' respective obligations to cover the settlement liability.
 
 B.
 
 14
 As originally filed, the underlying action named five defendants: VMS Lansdowne, VMS Development, Benchmark Management, Benchmark Conference, and Benchmark Hospitality, Inc. But by settlement time Benchmark Hospitality had dropped out, leaving the other four as the named defendants to the suit. Appellants contend that the natural division of the settlement liability is equally between the four settling parties.
 
 
 15
 AISLIC, however, asserts that the settlement should be divided three ways: between the VMS entities (i.e., VMS Lansdowne and VMS Development), Benchmark Management, and Benchmark Conference only. As support, AISLIC notes that the sole basis for the liability asserted in the complaint for each VMS entity is identical — ownership of the resort. In contrast, the complaint named Benchmark Conference and Benchmark Management for separate reasons (the former employed the "culinary persons" and the latter "sold the food"). From this distinction AISLIC reasons that the VMS entities, the collective "owner," should only be assigned one share of the settlement liability, with one going to Benchmark Conference, the "employer," and one going to Benchmark Management, the "operator." Br. of Appellee at 33.
 
 
 16
 But AISLIC's proposed division is contrary to the general rule in Virginia, and without any identified basis in law. As joint tortfeasors, the named defendants are each liable for the entire settlement amount, the allocation of which is a question of contribution. See Ohio Cas. Ins. Co. v. State Farm Fire and Cas. Co., 262 Va. 238, 546 S.E.2d 421, 423 (2001). Generally, such joint liability is allocated by equal division between the liable parties. See Wiley N. Jackson Co. v. City of Norfolk, 197 Va. 62, 87 S.E.2d 781, 784 (1955) ("The right to contribution ... is based on the broad principles of equity that where two or more persons are subject to a common burden it shall be borne equally....").
 
 
 17
 Moreover, the settlement agreement provides no support for treating the VMS entities differently than the Benchmark entities (Benchmark Management and Benchmark Conference) when apportioning liability. In particular, the settlement agreement mentions both VMS Lansdowne and VMS Development as defendants to the very suit that the agreement settled and establishes the "collective liability of the defendants," (emphasis added), which necessarily includes VMS Development. Moreover, the record suggests that if VMS Development was improperly sued, it could have been dismissed from the case prior to settlement, as Benchmark Hospitality was. In sum, AISLIC presents no recognized equitable argument for its proposed allocation of liability, and we see none. Cf. Nationwide Mut. Ins. Co. v. Jewel Tea Co., 202 Va. 527, 118 S.E.2d 646, 648-49 (1961) (explaining ways in which an alleged joint tortfeasor might challenge his obligation to contribute to a compromise settlement). Accordingly, we assess each of the four named defendants an equal share of the settlement.[2]
 
 IV.
 
 18
 Since there are no genuine issues of material fact, in a simpler case we would just proceed to construe the policies at issue and assess liability to each insurer in accordance with its policy obligations to each insured. Here, however, our analysis is complicated by each side's conflicting assertions.
 
 
 19
 For its part, AISLIC concedes that Benchmark Management is insured under both insurance lines. But AISLIC rejects the district court's conclusion below, and appellants' argument in this court, that with respect to Benchmark Management, the St. Paul/TIG line provides contingent excess coverage applicable only if the CNA/AISLIC line is exhausted or fails to respond. AISLIC reasons that the policies in each line contain "other insurance" clauses (also known as "excess insurance" clauses) that, on their face, would make the coverage provided by those policies excess insurance relative to the insurance provided by the policies of the other line. Since there is, AISLIC contends, no reason to consider either line's other insurance provisions superior to the other's, the other insurance clauses are "mutually repugnant,"[3] requiring equal division of Benchmark Management's liability between the two lines. And if Benchmark Conference is also considered to be insured by all four insurance polices, AISLIC contends the same result must follow for its settlement share.
 
 
 20
 For appellants' part, they first contend, and we agree, that in analyzing the insurance policies, the district court only construed the indemnification provisions as an attempt by appellants to use extrinsic evidence to modify the terms of the CNA and AISLIC policies. The district court thus failed to address appellants' argument that VMS Lansdowne is obligated to indemnify Benchmark Conference, and the CNA/AISLIC line to insure that liability, regardless of whether Benchmark Conference was itself insured under that line. But if, as appellants contend, the settlement liabilities of the Benchmark entities must be indemnified by VMS Lansdowne, and if the CNA/AISLIC line must cover VMS Lansdowne's indemnification duty in full, then St. Paul and TIG would have no obligation to pay into the settlement.
 
 
 21
 In proving up that contention, appellants argue that the CNA and AISLIC policies must respond first to satisfy the settlement because the MMA requires VMS Lansdowne to indemnify Benchmark Management, as the Operator, and Benchmark Conference, as Benchmark Management's agent, for their share of the settlement. In this regard, appellants rely on cases that give priority to indemnification agreements between the insured in assessing the respective obligations of the insurers and hold that such agreements may prevent the indemnitee's insurer from being liable for a settlement arising from a covered loss, notwithstanding the existence of an "other insurance" clause in the indemnitor's insurance policy. In response, AISLIC denies the applicability of the indemnification provisions and suggests that, in any event, such issues should be deferred for a separate proceeding.
 
 
 22
 We agree with appellants, and predict that under these circumstances Virginia would apply the indemnification provisions now rather than wait for a subsequent action that would produce the same result. Moreover, we conclude that the indemnification provisions control the allocation of liability between the insurers in this case because it results in VMS Lansdowne having responsibility for the Benchmark entities' shares of the settlement. Since that results in the St. Paul/TIG line having no obligation to cover any of the settlement liability, the alleged conflict between the two lines' other insurance provisions is irrelevant.
 
 A.
 
 23
 Appellants' claim respecting the MMA's indemnification provisions rests heavily on Wal-Mart Stores, Inc. v. RLI Ins. Co., 292 F.3d 583 (8th Cir.2002). In that case, the Eighth Circuit predicted that Arkansas would follow the growing trend of jurisdictions that allowed valid, enforceable indemnification agreements to "determine the allocation of liability in an insurance dispute." Id. at 588. In particular, the general rule, as stated by a "leading commentator," is that "an indemnity agreement between the insureds or a contract with an indemnification clause ... may shift an entire loss to a particular insurer notwithstanding the existence of an `other insurance' clause in its policy." Id. (quoting Lee R. Russ & Thomas F. Segalla, 15 Couch on Insurance, § 219:1, at 219-7 (3d ed.1999)).
 
 
 24
 The dispute in Wal-Mart Stores arose out of a sales agreement between Cheyenne, a distributor of halogen lamps, and Wal-Mart, which sold those lamps at retail. The agreement required Cheyenne to indemnify Wal-Mart for any liability arising from Wal-Mart's sale of the lamps. After one of the lamps malfunctioned, the injured plaintiff sued Wal-Mart and Cheyenne in state court. Cheyenne had procured insurance covering itself and Wal-Mart from St. Paul, which provided $1 million primary coverage, and from RLI, which provided $10 million in excess coverage over the St. Paul policy, coverage which extended to Cheyenne's contractual indemnity obligation to Wal-Mart. Wal-Mart, however, was also covered by its own $10 million policy with another insurer, National Union, which did not cover Cheyenne. The RLI policy was excess to any non-scheduled policy, which included the National Union policy.
 
 
 25
 The underlying suit was settled for $11 million. St. Paul paid $1 million of that settlement, and the remaining $10 million was paid by RLI, which reserved the right to seek recovery from Wal-Mart and National Union. Subsequently, Wal-Mart and National Union brought a declaratory judgment action to determine whether either was obligated for any part of the settlement. RLI counterclaimed, contending that its policy applied in excess of National Union's, so that it was entitled to contribution from National Union, Wal-Mart's primary insurer, for all or part of the $10 million it had paid.
 
 
 26
 In an extensively researched opinion, the Eighth Circuit predicted that Arkansas would give priority to the indemnity agreement at issue in that case in assessing the relative obligations of the insureds before allocating payment of the settlement between the insurers, and accordingly held that neither National Union nor Wal-Mart was obligated to contribute anything to the underlying settlement. Thus, despite RLI's policy providing excess coverage over National Union's as to Wal-Mart, RLI, as Cheyenne's insurer, was liable for the entire $10 million remainder of the settlement.
 
 
 27
 The Wal-Mart Stores court justified its decision for several reasons relevant to this case. First, the court stated that "examination of the relationships between the parties has convinced us that Cheyenne intended to and did make a valid promise to indemnify Wal-Mart for claims arising from the halogen lamps." Id. at 587. Second, the court determined that "RLI provided liability insurance to Cheyenne that covers both the Boykin settlement and Cheyenne's indemnification obligation." Id. Third, the court explained that under the circumstances of that case, "consideration of the indemnity agreement reflects the intention of [and relationship between] the parties and does not unfairly prejudice the insurers." Id. Finally, the court reasoned that consideration of Cheyenne's indemnification obligation at that stage in the litigation was proper because "mak[ing] Wal-Mart or National Union liable to RLI" — the anticipated result of considering the policies without consideration of the indemnification agreement — "would simply be the first step in a circular chain of litigation that ultimately would end with RLI still having to pay the $10 million." Id.
 
 B.
 
 28
 The opinion in Wal-Mart Stores demonstrates that several jurisdictions have addressed the issue with which we are faced. Nevertheless, the parties have identified no Virginia precedents that explicitly recognize the principles discussed in that case, and, except where Virginia cases are cited in our analysis below, our independent research has revealed little of direct, or even indirect, import to the question of whether the MMA's indemnification provisions should be considered in assessing the coverage responsibilities of the insurers in this case. Thus, we must predict how Virginia would address the issue.
 
 
 29
 As a federal court sitting in diversity, we are obliged to apply the jurisprudence of the Supreme Court of Virginia on issues of Virginia law.[4] See Private Mortg. Inv. Servs., Inc. v. Hotel and Club Assocs., Inc., 296 F.3d 308, 312 (4th Cir.2002). Where, as here, that court "has spoken neither directly nor indirectly on the particular issue before us, we are called upon to predict how that court would rule if presented with the issue." Id. In so predicting how that court would decide the issue, we may consider the teachings of treatises, id., as well as "the practices of other states." Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir.1999).
 
 
 30
 Here, a prominent treatise has acknowledged the "well recognized" principle applied in Wal-Mart Stores. Am. Indem. Lloyds v. Travelers Prop. & Cas. Ins. Co., 335 F.3d 429, 436 (5th Cir.2003) (citing 15 Couch on Insurance § 219:1). Further, all indications are that most, if not all, jurisdictions to have faced the question of whether an indemnification agreement could relieve particular insurers of an obligation to pay, without resort to a separate action to enforce the indemnification agreement, have answered in the affirmative. See id. at 436-41 (collecting and discussing cases); Wal-Mart Stores, 292 F.3d at 588-94 (same).[5]
 
 
 31
 While we do not belabor the issue as to every point for which Virginia law is unclear, we believe that the cases and principles relied on in Wal-Mart Stores, and applied herein, represent general practices and the majority position on the respective issues, see id. at 589 n. 1 (reaching similar conclusion), and would be adopted by the Supreme Court of Virginia in the appropriate case. As stated by the Fifth Circuit in predicting that Texas would apply the rules recognized in Wal-Mart Stores to reach a similar result, "[t]he holding and reasoning of the well considered Wal-Mart Stores opinion [are] applicable here." Am. Indem. Lloyds, 335 F.3d at 436. In particular, we think Virginia would give priority to the MMA's indemnification provisions at least where the record evidence demonstrates that all of the relevant considerations relied on in Wal-Mart Stores favored considering the indemnification provisions in this proceeding rather than a later one. An examination of whether such is actually the case here follows.
 
 1.
 
 32
 The first issue is whether VMS Lansdowne is obligated to indemnify both Benchmark Management and Benchmark Conference for their respective shares of the settlement. Section 6.6 of the MMA, entitled "Mutual Indemnification," contains provisions specifying when either the Owner, VMS Lansdowne, or the Operator, Benchmark Management, is obligated to indemnify the other (and possibly other parties). Under these provisions, VMS Lansdowne is obligated "to indemnify and hold harmless [Benchmark Management], its agents, and employees from and against any ... liability, loss, damage, cost or expense" caused by
 
 
 33
 any act or omissions, negligent, tortious or otherwise, of any agent or employee of [VMS Lansdowne] or [Benchmark Management] in the performance of this Agreement, except this provision will not apply to any such liability arising from any fraud, willful misconduct or gross negligence of [Benchmark Management], its employees or agents.
 
 
 34
 J.A. 153-54. Conversely, Benchmark Management is obligated to
 
 
 35
 indemnify and hold harmless [VMS Lansdowne], its agents and employees from and against any liability, loss, damage, cost or expense ... arising from any fraud, willful misconduct or gross negligence of [Benchmark Management], its agents and employees.
 
 
 36
 J.A. 154. Thus, assuming the settlement liability otherwise falls under the scope of the provisions, the classification of the settlement liability as arising from ordinary negligence or the like on one hand, or as gross negligence or the like on the other, will determine whether the indemnification obligation rests on VMS Lansdowne or on Benchmark Management.
 
 2.
 
 37
 On this point, however, AISLIC claims that because the underlying litigation was settled prior to trial, the record does not demonstrate whether indemnification would run only from the Owner to the Operator. Indeed, given the reciprocality of the indemnification provisions, obligations to indemnify could, AISLIC claims, run both ways. In light of this uncertainty, AISLIC suggests that determination of indemnification obligations under the MMA is best left for a subsequent action.
 
 
 38
 We reject AISLIC's contention; the record evidence is more than sufficient to conclude that the settled liability did not arise from "fraud, gross negligence, or willful conduct," but instead arose from acts or omissions on the order of ordinary negligence, for which VMS Lansdowne is obligated under the MMA to provide indemnification. For one, this settlement agreement here "memorialize[d] the final compromise and settlement of [the action brought by the plaintiff against the named defendants]." J.A. 352. Thus, we can only look to the plaintiff's lawsuit as it stood at the time of settlement.
 
 
 39
 And while the settlement agreement is silent on this point, the complaint for the action that agreement settled is not. Neither the facts Merritt pled nor the types of claims Merritt asserted, as represented in his final amended complaint, give rise to any suggestion that his food poisoning was caused by the type of action for which Benchmark Management would have to indemnify VMS Lansdowne. For example, gross negligence requires "action which shows indifference to others, disregarding prudence to the level that the safety of others is completely neglected.... [It] is negligence which shocks fair-minded people...." Wilby v. Gostel, 265 Va. 437, 578 S.E.2d 796, 801 (2003). The underlying action, though, arose from an alleged incident of food poisoning that occurred while the plaintiff was attending the resort. As might be expected, the actual claims against the named defendants were based on theories of breach of warranty, negligence, negligence per se, and res ipsa loquitor — all of which give rise to an indemnification obligation solely on behalf of VMS Lansdowne. The facts pled by Merritt in the complaint were of like dimension. The simple fact is that no record evidence would allow a reasonable jury to conclude that the settled claim for bodily injury arose from gross negligence. The evidence similarly fails to give any indication that Merritt's injury arose from fraud or willful conduct.
 
 
 40
 AISLIC, however, protests that it is improper to rely on the complaint for this analysis because, had the case not settled, the plaintiff could have added a claim for gross negligence. In essence, AISLIC contends that the lack of any judicial determination that Merritt's injuries resulted only from ordinary negligence prevents any classification of the settlement liability for indemnification purposes. But AISLIC cites no authority for this proposition, and our independent review indicates that the weight of authorities would allow an indemnification claim to rely on a settled liability. See, e.g., Keys v. Rehab. Ctrs., Inc., 574 So.2d 579, 584-85 (Miss.1990) ("indemnifying parties ... have no right to insist that their indemnitee endure the hazards of trial by jury [to establish the indemnitee's liability] as a condition for enforcing the indemnity agreement."). Moreover, courts have relied on the type of fault asserted in the claims against the indemnitee in order to determine whether the relevant acts or omissions fall within the scope of restrictive language of fault contained in the indemnification agreement. See, e.g., Priolo v. Compacker, Inc., 321 N.J.Super. 21, 728 A.2d 239, 246 (1999). We see no reason why Virginia would hold to the contrary on this point. The fact remains that the record evidence would allow for a conclusion that the settled claim of bodily injury arose from ordinary evidence and the like, but would not allow for the same conclusion as to gross negligence.[6]
 
 3.
 
 41
 Having concluded that the record evidence is sufficient to determine that the settlement liability was of the type VMS Lansdowne is obligated to indemnify, we next turn to whether the acts or omissions which allegedly caused the food poisoning (i.e., those that gave rise to the settled claim) are encompassed by the VMS Lansdowne's indemnification obligation under the MMA.
 
 
 42
 Certainly, a reasonable jury would have to conclude that the alleged food poisoning was caused by a person or persons covered by the indemnification provisions. Since those provisions cover liability arising from "any act or omissions ... of any agent or employee of Owner [VMS Lansdowne] or Operator [Benchmark Management] in the performance of this Agreement," there is no reasonable basis in the evidence that it does not cover the activities which produced the settled liability; that is, the activities of everyone at the resort who served, prepared, or was otherwise involved with the meal that poisoned Merritt. (As shown below, Benchmark Conference and its employees acted as agents of Benchmark Management under Virginia law.) AISLIC's contrary argument that "indemnification is only available for acts or omissions of the Operator," and not its agents or employees (or even those of VMS Lansdowne) — that is, "only the acts or omissions of Benchmark Management itself," Br. for Appellee at 31 — does not withstand minimal scrutiny.
 
 4.
 
 43
 Given the above analysis, Benchmark Management, as Operator of the Resort, would be entitled to indemnification for its share of the settlement from VMS Lansdowne. The question still remains, however, of whether VMS Lansdowne is obligated to indemnify Benchmark Conference for its share as well. The resolution of this question turns on whether Benchmark Conference is an "agent" of Benchmark Management as meant by the MMA. Appellants, looking to the MMA and the role Benchmark Conference actually played, contend that Benchmark Conference acted as Benchmark Management's agent in the management and operation of the resort. In contrast, AISLIC asserts that Benchmark Conference did not act as an agent for Benchmark Management when employing workers, but was itself a principal, and thus is not entitled to indemnification under the MMA.
 
 
 44
 We think appellants have the stronger argument. Of particular relevance in this regard is the Supreme Court of Virginia's decision in Richmond, F. & P.R. Co. v. Hughes-Keegan, Inc., 207 Va. 765, 152 S.E.2d 28 (1967). In Hughes-Keegan, a railroad contractor was contractually obligated to indemnify a railroad for liability resulting from acts or omissions of the contractor's agents. The court concluded that a crane operator who was hired by the contractor and who allegedly caused the death of a railroad worker was an agent as used in the indemnity clause. The court reasoned that "[w]hen [the contractor] called upon [the crane operator] to discharge an obligation of [the contractor]" that "the parties contemplated that [the contractor] could perform on its own or through others," "it made [the crane operator and its] employees [the contractor's] agents for the purposes of the contract." Id. at 32.
 
 
 45
 Both general agency principles and the specific authority of Hughes-Keegan militate in favor of Benchmark Conference (and, for that matter, its employees) being an agent of Benchmark Management under the MMA. Here, Benchmark Management, the "sole and exclusive manager" of the Resort, is obliged by the explicit terms of the MMA to have a subsidiary employ all non-executive employees at the resort. Benchmark Conference was created for that very purpose and, like the crane operator in Hughes-Keegan, satisfied that obligation of the MMA. Moreover, the MMA grants Benchmark Management broad control over Benchmark Conference and its employees in the operation of the resort; while Benchmark Conference may have held the actual employment contracts for Resort staff, Benchmark Management ultimately controlled who Benchmark Conference employed. See Allen v. Lindstrom, 237 Va. 489, 379 S.E.2d 450, 454 (1989) (observing that "[t]he power of control is the determining factor in ascertaining the alleged agent's status").
 
 C.
 
 46
 We next decide whether the CNA and AISLIC policies insured VMS Lansdowne's obligation to indemnify the Benchmark entities for their portions of the settlement liability. Unlike was the case with the basic applicability of the indemnification provisions, AISLIC does not seriously dispute that the CNA/AISLIC line must cover such an obligation. And for good reason: the CNA policy covers VMS Lansdowne's indemnification obligation because the indemnification provisions constitute an "insured contract" under the policy, as they are contained in an agreement (the MMA) pertaining to VMS Lansdowne's business (the Resort) and obligate VMS Lansdowne to assume the tort liability of another party (Benchmark Management and Benchmark Conference) to pay for bodily injury (food poisoning) to a third person (Merritt) occurring subsequent to the MMA's execution. See J.A. 187, 196. The AISLIC policy similarly covers VMS Lansdowne's obligation in this regard. See J.A. 231, 234.
 
 D.
 
 47
 Next, we examine whether considering the indemnification provisions now would reflect the intentions and relationships of the parties, while not unfairly prejudicing the insurers. See Wal-Mart Stores, 292 F.3d at 587. As to the first point, the Wal-Mart Stores court concluded that there was "a close factual relationship between the indemnity obligation [at issue] and the insurance contracts," reasoning that the RLI policy, though perhaps not specifically bought for Wal-Mart, "nevertheless satisfied the requirements of the vendor contract" that Cheyenne carry relevant liability insurance. Id. at 589-90. Here, however, there is explicit evidence that VMS Lansdowne procured the CNA/AISLIC line to serve as the insurance required by the agreement. See J.A. 382-83. Thus, the "factual relationship between the indemnity obligation [in the MMA] and the insurance contracts" at issue — here, the CNA and AISLIC policies — is even closer than was the case in Wal-Mart Stores.
 
 
 48
 As to the second point, AISLIC has not shown that it will be unfairly prejudiced by our refusal to defer considering the indemnification provisions until a separate case. For example, AISLIC does not argue on appeal that the timing of appellants' indemnification claim prevented AISLIC from adducing relevant evidence or from otherwise raising a sufficient defense. Rather, the thrust of AISLIC's argument in support of deferring this issue for a later action is that the evidence already before us would not support a definitive conclusion either way. But that this court shows its disagreement with AISLIC's reading of the evidence by holding that the record supports, as a matter of law, VMS Lansdowne's obligation to indemnify Benchmark Management and its agent for the settlement liability, does not mean that AISLIC's defense against appellants' indemnification claim has been unfairly prejudiced.
 
 
 49
 Finally, we conclude that judicial economy favors requiring CNA/AISLIC to cover this liability. As was the case in Wal-Mart Stores, it appears from the record that deferring consideration of the MMA's indemnification provisions for a later proceeding would produce "circular litigation," id. at 587, that would only delay the inevitable — CNA and AISLIC assuming full liability for the settlement amount.
 
 E.
 
 50
 In light of the above analysis of the considerations identified in Wal-Mart Stores, we predict that Virginia would conclude that the indemnification obligations set forth in the MMA need not be set aside for a separate proceeding but should be considered in this case before allocating responsibility for the settlement liability according to the terms of the relevant policies. Given the conclusions set forth above, we hold that the CNA/AISLIC line is primarily responsible for the Benchmark Entities' share of the settlement. Since the CNA/AISLIC line can pay the full settlement amount without being exhausted, St. Paul and TIG have no obligation to contribute to the settlement.
 
 V.
 
 51
 As a final matter, we must address AISLIC's contention that VMS Development is not insured under the AISLIC policy, and thus AISLIC is not obligated to contribute towards VMS Development's share of the settlement. It is undisputed that VMS Development is listed as a "Named Insured" in the CNA policy, and thus its share of the settlement is covered by that policy. While VMS Development is not listed as a Named Insured in the AISLIC policy, one of the definitions in that policy of an "Insured" is "[a]ny person or organization other than the Named Insured included as an additional insured in the Schedule of Underlying Insurance," which includes the CNA policy. J.A. 234. But AISLIC contends, relying on "the distinction between `Additional Insureds' and `Named Insureds,'" Br. of Appellee at 35, that since VMS Development is not specified as an "Additional Insured" in the CNA policy, VMS Development is not covered under the alternate definition of "Insured" in the AISLIC policy.
 
 
 52
 Despite AISLIC's borderline-duplicitous unremarked capitalization of quoted materials in the argument section of its brief — which has the effect of making "additional insured" appear to be a defined term in the AISLIC policy[7] — "additional insured" is not so defined. Nothing in that policy states, e.g., that "additional insured" references the definition of "Additional Insured" in any other policy. Since the provision at issue can be reasonably read to use "additional insured" to refer as those persons "other than the `Named Insured'" of the AIS-LIC Policy (VMS Lansdowne) that are insured under the CNA policy (which would include VMS Development), "additional insured" is, at minimum, ambiguous.
 
 
 53
 Given that Illinois law (which governs the AISLIC policy's interpretation) construes ambiguous terms in insurance policies in favor of coverage, see West Bend Mut. Ins. Co. v. Mulligan Masonry Co., Inc., 337 Ill.App.3d 698, 272 Ill.Dec. 244, 786 N.E.2d 1078, 1083 (2003), appeal denied, 205 Ill.2d 651, 281 Ill.Dec. 99, 803 N.E.2d 503 (2003), we hold that VMS Development is an "Insured" under the AISLIC policy, requiring AISLIC to cover the portion of its settlement liability that remains after exhaustion of the CNA policy. Because CNA and AISLIC have initial responsibility for all of the parties to the settlement, CNA, as primary insurer, is responsible for $1 million of the settlement ( its policy limit), and AISLIC, as excess insurer, is responsible for the remainder.
 
 CONCLUSION
 
 54
 Because we conclude that CNA and AISLIC are obligated to cover the entire settlement amount, the judgment of the district court is reversed. The case is remanded with instructions to enter summary judgment in favor of St. Paul and TIG and to order AISLIC to reimburse St. Paul for the $1 million St. Paul has already paid toward the settlement and pay toward the settlement the $1 million plus interest for which TIG was erroneously held to be responsible.
 
 
 REVERSED AND REMANDED
 
 
 
 Notes:
 
 
 [1]
 CNA did not file a motion for summary judgment below and does not participate in this appeal, apparently conceding that its policy obligations will be exhausted in any event
 
 
 [2]
 While our analysis does not require us to address the point, we think appellants are likely correct that, given these principles of Virginia law, the district court erred by allocating liability between the excess insurers without reference to,e.g., the relative liability of the insureds under each policy.
 
 
 [3]
 Home Ins. Co. v. Certain Underwriters at Lloyd's London, 729 F.2d 1132, 1136 (7th Cir.1984) ("If two applicable policies contain excess clauses, however, such provisions are to be disregarded as being mutually repugnant and each company is liable for a pro rata share of the liability.") (internal quotation marks omitted).
 
 
 [4]
 Admittedly, Virginia's choice-of-law principles dictate that we apply the law of Illinois when interpreting the CNA and AISLIC policies, the law of Washington when interpreting the St. Paul and TIG policies, and the law of Virginia when interpreting the MMASee Hitachi Credit Am., 166 F.3d at 623-24 (4th Cir.1999). Once these agreements have been construed, however, we believe the assessment of liability between the insurers based on their policy obligations, which includes questions as to the priority to be given an indemnification agreement between insureds, is governed by Virginia law.
 
 
 [5]
 In particular, theWal-Mart Stores court thoroughly canvassed the relevant precedents in determining that the majority of jurisdictions having addressed the subject apply an indemnification agreement between parties in determining the factually-related obligations of insurers to cover those parties' liabilities, see id. at 588 In fact, the court identified only one contrary case involving insureds bound by an indemnification agreement, id. at 591 (citing Reliance Nat'l Indem. Co. v. General Star Indem. Co., 72 Cal.App.4th 1063, 85 Cal.Rptr.2d 627 (1999)), and noted that the case was itself in apparent conflict with an earlier decision of the Supreme Court of California. See id. at 592 (citing Rossmoor Sanitation, Inc. v. Pylon, Inc., 13 Cal.3d 622, 119 Cal.Rptr. 449, 532 P.2d 97 (1975)).
 
 
 [6]
 AISLIC also claims that the settlement agreement vitiates any claim for indemnification because that agreement finalized the defendants' responsibility forseparate shares of the settlement. This contention is baseless; the settlement only "establish[ed] the ultimate collective liability of the defendants to the plaintiff"; it did not, by itself, apportion shares of that liability in any respect. J.A. 352-53 (emphasis added). Indeed, the settlement agreement explicitly provided that "[t]his agreement specifically shall not be used to establish admissions, waiver, estoppel or any other theory of liability or defense in the anticipated coverage dispute litigation," J.A. 353, a litigation which is now before this court, and in which the separate liability of the settling parties is directly at issue.
 
 
 [7]
 Compare J.A. 234 (stating that "[a]ny person ... included as an additional insured" in the CNA policy is an "Insured") with Br. for Appellee at 35 (stating that "[a]ny person ... included as an ADDITIONAL INSURED" in the CNA policy is an "Insured")(all capitals added without comment).